[Crim. No. 20612. First Dist., Div. One. Aug. 8, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUIS SALAZAR, Defendant and Appellant.

**COUNSEL**

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Alvin J. Knudson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**THE COURT.\***—This is an appeal from a judgment sentencing defendant to state prison for the middle term of five years after a jury found him guilty of kidnaping (Pen. Code, §§ 207, 208). Defendant contends the trial court committed prejudicial error when it instructed on "flight"; that the act committed does not fall within the statutory definition of kidnaping; and that the court failed to state adequate reasons for denying probation. Our analysis of the above contentions causes us to affirm the conviction but remand the matter for resentencing.

On June 3, 1979, between 2:30 and 3 a.m., Mrs. Mary Machado stopped her two-door 1971 Datsun in the parking lot of Marshall's Grocery Store in Aromas, California. Mrs. Machado, who lived three-

---

*Before Elkington, Acting P. J., Newsom, J., and Grodin, J.

quarters of a mile from the store, had just had a fight with her husband and had decided to take her five-month-old baby to her mother's home in Watsonville. The baby was beside her in the vehicle when she stopped in the parking lot to dry her tears. The car windows were rolled up, and the doors, although unlocked, were closed. It was dark, but there were street lights in the area bright enough to illuminate the inside.

As Mrs. Machado was sitting in her car, defendant opened the passenger side door and jumped in, landing on top of her baby. Mrs. Machado was startled and yelled at him to get off her baby. Defendant complied, and then asked her what she was doing. She replied that she was not doing anything and told him at least five or six times to get out of the car. Defendant refused and threatened her by indicating that he had something in his pocket. Defendant then forced Mrs. Machado to drive her car to Blohm Avenue. She did so, holding her baby in her arms. As she drove, she began screaming and honking her horn to attract attention. Defendant threatened her once more, telling her to stop screaming "or else."

When Mrs. Machado reached her own house, about three-quarters of a mile from Marshall's store, she attempted to swerve into her driveway. Defendant, however, grabbed the wheel and yanked the vehicle back. Mrs. Machado began screaming and honking her horn again. Defendant again told her to shut up "or else." Mrs. Machado drove another one-quarter mile and then, while pretending to have car trouble, "popped" the clutch to make the engine die. Defendant accused her of stopping the automobile on purpose, but she replied that it always behaved this way. At some point while the car was stopped, defendant put his hands around Mrs. Machado's neck and choked her. She then observed him looking at her purse and told him to take it. Defendant said he did not want the purse and threw it into the back seat. Mrs. Machado jumped from the vehicle with her baby and ran to a neighbor's house. When she looked back, defendant was gone.

When Mrs. Machado returned to her automobile about an hour later with the police, the purse was missing from the back seat. It was returned later by a neighbor who found it in a field adjacent to where her car had been stopped. Footprints led from the car to the field.

Mrs. Machado was unable to recall anything about the shirt that defendant was wearing, but said he had been wearing dark pants and a black or dark-blue "beanie" cap. The police, pursuant to a search warrant, found a tan-striped shirt and a dark-blue knit cap in defendant's residence. Mrs. Machado identified the cap as the one defendant wore the night of the incident.

Bill Reynolds, who is employed by the Southern Pacific Railroad police, was conducting a surveillance in the area of Carpenteria and Aromas Road in Aromas during the early morning hours of June 3, 1979. He was located one-half mile from Marshall's Grocery Store. Between 3 and 3:30 a.m., he heard an automobile horn honking and the sound of a woman screaming. Reynolds and his companion, Officer Cohen, drove up Carpenteria and down Blohm Road to investigate. Along the way they encountered two females walking down the road. These women pointed out an automobile and gave Reynolds the description of a Mexican male, five feet seven inches, short hair, wearing a striped shirt and blue jeans. Reynolds and Cohen then saw Mrs. Machado's automobile parked diagonally in the street with both doors open and the headlights on. They stopped to investigate, but found no one in the car. They found Mrs. Machado on the street a few seconds later.

Subsequently, Deputy Sheriff John P. Stevens of the San Marino Sheriff's Department met Mrs. Machado at the Aromas fire station and observed red marks on her neck.

Judy Ann Houck said that on June 3, about 3 a.m., she and her girlfriend walked to a park near Marshall's store and saw defendant in the park talking with Ms. Houck's brother. Ms. Houck and her girlfriend went over to the two men and talked to them. Afterwards, defendant walked down Carpenteria, away from Marshall's store. The two women walked down Blohm Avenue and saw a man walk over to an automobile parked in the parking lot of the store. Ms. Houck said that because it was dark, she was unable to positively identify the man as defendant. However, she had testified at the preliminary hearing that she had seen defendant go to an automobile in the parking lot. At trial, she stated that the man could have been defendant and that the man was wearing a blue-striped shirt. On cross-examination, however, she said the man was not wearing a striped shirt. When she talked with defendant the night of the incident, he was wearing a striped shirt, blue corduroys and a dark-blue or black "beanie." Ms. Houck and her girlfriend then

watched the man get into the car. They saw the car drive away without its lights, then swerve toward a driveway and swerve away, and they heard screaming and a honking horn.

Deputy Sheriff Curtis Hill said that prior to trial he took a tan-striped shirt, which had been seized at defendant's apartment pursuant to a search warrant, and showed it to Ms. Houck and her girlfriend. Ms. Houck positively identified the shirt as the one defendant wore the night in question. At trial, Ms. Houck said she did not recognize this shirt.

*Defense Evidence*

Gary Houck, Judy Ann Houck's brother, said that he met defendant about 12:30 a.m. on June 3, and that defendant was wearing a blue T-shirt all night long, and not a striped shirt.

Cecilia Hurtado lived with defendant. She saw him on June 2 at 8 p.m. and on June 3 at 3 a.m. when he came home to bed. At both times he was wearing a navy-blue shirt without stripes, navy-blue pants, and a navy-blue "beanie."

Defendant's mother saw him at midnight and 5 a.m.; he was wearing a navy-blue shirt at both times. The shirt seized at defendant's residence was not the shirt he was wearing, although he had been wearing the hat seized.

Defendant testified and admitted being across the street from Marshall's store about 1:30 or 2 a.m. He was wearing a blue, stripeless shirt. After talking with Gary Houck, his sister, and her girlfriend, defendant walked home, arriving about 2:30 or 3 a.m. He said he did not see a car in the parking lot of Marshall's store; he did not go into the parking lot; and he did not go into Mrs. Machado's vehicle.

■ Defendant's initial contention is that the trial court committed prejudicial error in instructing the jury on "flight."[1] The People concede, under compulsion of the holding in *People v. Anjell* (1979) 100

---

[1]The instruction given read as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstances is entitled is a matter for the jury to determine."

Cal.App.3d 189 [160 Cal.Rptr. 669], that error was committed, but argue that it was harmless. We agree with the People. As in *Anjell*, the main issue below was not whether the elements of the crime were proved, but whether defendant was the perpetrator. Because identity was the contested issue, the giving of an instruction on flight was error. (See *People v. Anjell, supra*, 100 Cal.App.3d at pp. 199-200.)

We are persuaded that the error was harmless, however. (See *People v. Watson* (1956) 46 Cal.2d 818, 835-836 [299 P.2d 243], cert. den., 355 U.S. 846 [2 L.Ed.2d 55, 78 S.Ct. 70].) The prosecutor did not argue that any of defendant's actions constituted flight showing guilt (see *People v. Anjell, supra*, 100 Cal.App.3d at p. 201), and the evidence of defendant's guilt was overwhelming. Defendant admitted being in the area of the crime at the time it occurred, and the victim was certain of her identification of him as the kidnaper. The victim said her kidnaper was wearing dark pants and a dark-colored "beanie"; all witnesses, including those for the defense, agreed that defendant was so attired, and a dark beanie was found in his residence. A witness near the scene said the perpetrator wore a striped shirt, and a friend of defendant's testified on direct examination that the man she saw going into the victim's automobile was wearing a striped shirt. Although this same friend said at trial that she could not positively say this man was defendant, she was impeached by her preliminary hearing testimony wherein she said the man was defendant. Thus, even though several witnesses corroborated defendant's testimony that he was not wearing a striped shirt, there is overwhelming evidence which shows that he committed the offense.

The cases relied on by defendant do not compel a different conclusion in that this is not a close case which turns on the credibility of the two principal witnesses. In *People v. St. Andrew* (1980) 101 Cal.App.3d 450 [161 Cal.Rptr. 634], the case was a close one and involved a number of errors deemed prejudicial in their cumulative impact. The competency of the victim to testify was an issue, and there was evidence that the victim's husband, and not the defendant, may have been responsible for the sexual acts at issue. In *People v. Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203], one of the two victims was unable to identify the defendant in either the pretrial or trial proceedings. Thus, these cases are distinguishable and not dispositive.

■ Defendant next contends that because the victim "carried" him in her automobile, as opposed to him transporting her, the acts he com-

mitted do not constitute kidnaping as defined in Penal Code section 207.[2]

Section 207 provides in relevant part: "Every person who forcibly ...takes...any person...and *carries* him into...another part of the same county...is guilty of kidnaping." (Italics added.) Defendant would have us construe this language to mean that when, as here, the victim transports the defendant, there is no kidnaping. Such a construction is supported neither by logic nor authority.

Section 207 is to be given effect in its common sense meaning, and it is the duty of the courts to avoid absurd consequences and achieve a sensible construction. (*People v. Stanworth* (1974) 11 Cal.3d 588, 601 [114 Cal.Rptr. 250, 522 P.2d 1058].) Defendant's interpretation would lead to absurd consequences in that kidnaping would exist when the defendant drives the automobile, but false imprisonment, or some other offense, would exist when the victim is forced to drive. However, it is the "forcible removal" of one person by another that constitutes the essence of kidnaping (see *People v. Rich* (1960) 177 Cal.App.2d 617, 621 [2 Cal.Rptr. 600]; *People v. Cluchey* (1956) 142 Cal.App.2d 563, 565 [298 P.2d 633]), and the harm contemplated by the statute occurs at least as much when the victim is forced to do the driving as when the defendant does it.

We also note that "carrying" has many common definitions: to move while supporting, to sustain a load and bring along to another place; and to conduct, lead, guide. (See Webster's New Internat. Dict. (3d ed. 1965) p. 343.) Thus, a defendant can commit "kidnaping" simply by ordering a person to walk some substantial distance for a purpose not merely incidental to the commission of another crime (see *People v. Stanworth, supra*, 11 Cal.3d at pp. 596-603) although no carrying occurs in such a situation, except to the extent that each party "carries" himself. Thus, kidnaping does not occur only when the perpetrator does the transporting; it can occur as well when the victim does the transporting under threat of force.

---

[2]Defendant does not argue that he is free from criminal liability, but suggests that we should modify the judgment to reflect a conviction for felony false imprisonment. (See Pen. Code, §§ 236, 237, 1260.)

Finally, although defendant correctly argues that the cases relied on by the People do not expressly decide the question before us, they impliedly support the People's position. (See *People v. Rich, supra*, 177 Cal.App.2d at p. 621; *People v. Cluchey, supra*, 142 Cal.App.2d at pp. 565-566; *People v. Valdez* (1935) 3 Cal.App.2d 700, 701 [40 P.2d 592].) In all of these cases the victims were forced to drive the defendant, yet the courts found that the facts of each case established a kidnaping. In *People v. Rich, supra*, 177 Cal.App.2d 617, for example, the defendant forced the victim at knife point to drive him approximately 12 blocks. In *Cotton v. Superior Court* (1961) 56 Cal.2d 459, 464 [15 Cal.Rptr. 65, 364 P.2d 241], the Supreme Court stated that the facts in *Rich* "manifestly demonstrate" a kidnaping. Thus, we reject defendant's claim that the facts at issue fail to establish a kidnaping within the meaning of Penal Code section 207.

 We find merit in defendant's claim that the lower court failed to state adequate reasons for denying probation and sentencing him to state prison for the middle term. (See *People v. Arceo* (1979) 95 Cal. App.3d 117, 121 [157 Cal.Rptr. 10]; Pen. Code, § 1170, subd. (c); Cal. Rules of Court, rules 405(f) and 443.)[3] Under rule 443, the court's reasons are to be stated in simple language with reference to the primary factors that support the exercise of discretion. The statement should be complete by itself and should not refer to written documents for clarification. (See rule 443; *People v. Hernandez* (1979) 100 Cal.App.3d 637, 643 [160 Cal.Rptr. 607].)

The lower court found defendant to be an unfit subject for probation, stating that it had considered the nature of the crime, the probation officer's report, and the diagnostic report. These references are insufficient to constitute the requisite statement of reasons. (See *People v. Hernandez, supra,* 100 Cal.App.3d at p. 643; *People v. Arceo, supra,* 95 Cal.App.3d at pp. 121-122; *People v. Turner* (1978) 87 Cal.App.3d 244, 247 [150 Cal.Rptr. 807].) The People's contention

---

[3]We are aware of the recent decision in *People v. Butler* (1980) 107 Cal.App.3d 251 [165 Cal.Rptr. 709] to the effect that reasons for *denying* probation need not be given when the ultimate disposition is the upper term and the court properly states its reasons for that sentencing decision (see pp. 254-255). However, we consider ourselves governed by *People v. Arceo, supra*, 95 Cal.App.3d at page 121 inasmuch as the denial of probation here was followed by imposition of the middle term and no statement of reasons was given or required for that disposition (see *People v. Butler, supra,* 107 Cal.App.3d at pp. 254-255, fn. 4).

that reference to the probation report *and* the nature of the crime suffices was made and rejected in *People* v. *Arceo, supra*, 95 Cal.App.3d 117.[4]

The judgment of conviction is affirmed. The matter is ordered remanded to the trial court with directions to resentence defendant in accordance with the views expressed above.

---

[4]The People also contended that we should not address this issue inasmuch as defendant failed to raise it below. The authority relied on for this proposition was ordered unpublished by our Supreme Court. Because the same issue was addressed in *Hernandez, Arceo*, and *Turner*, without any indication that defendant had raised it below, we deem it proper to address it here as well.