[No. A040035. First Dist., Div. Two. May 2, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
TROY RHODES, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, III, IV and V.

## COUNSEL

Kent A. Russell, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Blair W. Hoffman and Ann K. Jensen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SMITH, J.**—A jury found defendant and appellant Troy Rhodes guilty of having committed arson of an inhabited structure in violation of Penal Code section 451, subdivision (b). Three prior felony convictions were alleged, two of which were found to be true and used to enhance his sentence. He was sentenced to a total of 13 years in state prison. On this appeal from the judgment, we will affirm the conviction but remand for resentencing.

### BACKGROUND

#### The Prosecution

On May 2, 1986, David and Caroline Micke lived at a house on Placer Drive in San Leandro with their two sons. At approximately 6:30 to 7 p.m. as they were unloading laundry, the couple were in the midst of a loud argument about money. Pacific Gas and Electric (PG&E) had cut off the gas and electricity to their home due to lack of payment, and Caroline was preparing to take the children to her father's house in Calaveras County.

At one point, Caroline stated that she was going to notify the sheriff's department to seek their assistance in leaving peaceably. Defendant, who lived in a tool shed adjacent to the Mickes' property, immediately came

running into the house and joined the argument. He was "acting weird" and was enraged because he was on parole and feared that he would be taken back to jail if the sheriff's deputies arrived. He threatened to "slit" Caroline's throat if she went to the sheriff. The Mickes told him to go back to his shed and the sheriff would not find him. Defendant exited, but pulled the ignition wires out of the Mickes' truck as he left.

Caroline became very upset and reported defendant's threat to a neighbor. She then returned to the house and asked her husband to fix the ignition wires. Dave reconnected the wires and Caroline drove off. After she left, however, defendant became increasingly angry and continued to argue with Dave. Dave kept telling defendant to go back to his shed and began pushing him out the door. Defendant repeated his threat to slit Caroline's throat and also threatened to burn down the Mickes' house and rape their children.

Eventually, Dave pushed defendant into his own backyard. During the argument Dave noticed he was wearing a blue jacket with a Union 76 decal. After defendant departed, Dave left the house. Although he secured the front and back doors, one of the windows in the back was rotted enough so that someone could enter through it without much difficulty.

Caroline returned to her house a short time later and was surprised to find the front door unlocked. She locked that door, but as she went around to the back, she encountered defendant, who was walking away from her back door carrying potted marijuana plants. Caroline assured him she had not gone to the sheriff; defendant stated succinctly, "[F]uck you, you snitchy bitch." Fearing for her safety, Caroline departed.

Caroline went to the home of one of the neighbors, Bob Shabert. She was upset and tearful and told him that defendant had threatened her. Defendant and Shabert had recently been giving each other "dirty looks," and in the past week defendant had threatened to break Shabert's arms and throw a molotov cocktail into his house. Moreover, that evening defendant told Shabert's brother Tim that he would get even with Caroline for calling the cops—he had connections to obtain a grenade launcher and would "blow the fucking bitch up."

While Bob Shabert was talking to Caroline on the front porch, he heard a noise that sounded like a door slam coming from the Mickes' property. He went around to the back of the house and observed defendant walking toward his shed. Defendant remained there for about 30 seconds and then walked back toward the Mickes' house. Shabert lost sight of defendant momentarily, after which he heard a whooshing noise and the sound of broken glass. Shabert immediately jumped over the fence and saw defend-

ant running back toward his shed. The two men ran into each other and briefly exchanged words. Shabert then noticed a lot of smoke coming from the area of the Mickes' property. He notified the neighbors that the Mickes' house was on fire, and the fire department was summoned. Defendant returned to the Mickes' house with a hose and poured water on the fire.

Firefighters arrived and quickly put out the blaze. Four kittens were found dead inside the house. Bob Shabert informed a fire department deputy of defendant's threats to Caroline and her property. Defendant was detained at the scene for questioning and taken into custody on outstanding warrants.

A blue jacket was found outside the Mickes' house about 10 to 15 feet from the front door. The sleeves were turned inside out and it had a large burn hole on the back that appeared to be fresh. A book of matches and one used match were found in the jacket pockets. It was established at trial that the jacket belonged to defendant. Additionally an improvised torch was found in the front room area, consisting of a pair of women's panty hose attached to a stick with a rubber band. A half-full can of Coleman fuel was discovered inside defendant's shed.

Captains Brown and Silva of the fire department each testified that in their opinion the fire was definitely caused by arson. They based their opinions on the low amount of burn in the front room area, the rapid movement of the fire, the lack of a gas or electricity supply to the house, and the presence of the torch. Brown also theorized that whoever was wearing the blue jacket had used the torch as an ignition device; that after lighting the fire, some of the dripping nylon from the torch landed on the jacket causing it to burn, and that the person hurriedly removed and discarded the jacket as soon as he realized it was on fire.

### The Defense

Appellant testified in his own defense. He admitted that he intervened in the argument between the Mickes and asked Caroline not to call the sheriff, but denied threatening to harm her or burn their house. He testified that he was in his shed when he heard a noise, looked outside and heard Shabert say there was fire. He acknowledged that the jacket was his, but maintained that he threw it on the ground while fighting the fire and that the burn hole was caused by an earlier barbecue accident.

An arson investigator called by the defense could not rule out all accidental causes of the fire based upon his review of the reports and photographs. However, he stated he could give no opinion on whether the fire was intentionally set.

Appeal

I

. . . . . . . . . . . . . . . . . . . . . . .*

II

*Flight Instruction*

■ Over the objection of the defense, the trial court gave CALJIC No. 2.52 (Flight After Crime).[2] Defendant contends that this was error because "[i]t is well-settled that the flight instruction should not be given when . . . the identity of the perpetrator is a contested issue." (Citing *People* v. *Jackson* (1986) 187 Cal.App.3d 499, 511 [231 Cal.Rptr. 889].)

The quoted holding has its genesis in the case of *People* v. *Anjell* (1979) 100 Cal.App.3d 189, 199-200 [160 Cal.Rptr. 669] (*Anjell*), a decision emanating from this district. Although *Anjell* has been oft-cited and followed by *Jackson* and many other subsequent decisions (see, e.g., *People* v. *Moringlane* (1982) 127 Cal.App.3d 811, 821 [179 Cal.Rptr. 726]; *People* v. *Malgren* (1983) 139 Cal.App.3d 234, 242 [188 Cal.Rptr. 569]; *People* v. *Salazar* (1980) 108 Cal.App.3d 992, 998 [167 Cal.Rptr. 38]), it has recently come under a hail of criticism. (See *People* v. *Cowger* (1988) 202 Cal.App.3d 1066, 1073-1076 [249 Cal.Rptr. 240]; *People* v. *London* (1988) 206 Cal.App.3d 896, 904-905 [254 Cal.Rptr. 59]; *People* v. *Simon* (1989) 208 Cal.App.3d 841, 851 [256 Cal.Rptr. 373].) The Attorney General asks us to take up this chorus and to declare that *Anjell* is an "aberration." We believe however, that the recent attacks on *Anjell* are unwarranted and the result of a misconstruction of the opinion.

Most of the cases purporting to follow *Anjell* have repeated the now well-worn phrase that a flight instruction should not be given "where identity is a contested issue," without discussion. (See, e.g., *Jackson, Malgren* and *Salazar, supra.*) A careful reading of *Anjell* reveals that it does not stand for such a sweeping proposition.

Boiled down to its essentials, *Anjell,* which involved a prosecution for robbery, dealt with two independent purported justifications for a flight instruction—eyewitness testimony that the robbers fled the scene of the

---

*See footnote, *ante,* page 1471.

[2]The instruction, as read to the jury, stated: "Now the flight of a person immediately after the commission of a crime is not sufficient in itself to establish his guilt, but is a fact, which if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence, and the weight to which such circumstance is entitled is a matter for the jury to determine."

crime and statements by the defendant sometime afterward to the effect that he was thinking of going to Mexico. The *Anjell* court rejected the first justification because "[t]he fact that a robber fled the crime scene is of no assistance to a jury where the defendant does not dispute that all elements of the crime were present but denies that he was the robber." (*Anjell, supra,* 100 Cal.App.3d at pp. 199-200.) This is so because where the defendant contests his identity as the perpetrator, testimony that the perpetrator (whoever he was) fled the scene upon committing the crime does not, in any logical way, further connect the *defendant* with the commission of the crime.[3]

As to the other purported justification, *Anjell* held that defendant's mere statements indicating a desire to leave the country were also insufficient to warrant a flight instruction. If *Anjell* stood for the broad proposition that flight instructions should never be given when identity is contested, the court would not have found it necessary to reach the second issue. However, in discussing whether the defendant's "idle words" were sufficient to warrant the instruction, *Anjell* implicitly recognized an important qualification to the rule—that a flight instruction is appropriate where there is substantial evidence of flight by the defendant *apart from his identification as the perpetrator,* from which the jury could reasonably infer a consciousness of guilt. (See Pen. Code, § 1127c; *People* v. *Moringlane, supra,* 127 Cal.App.3d 811, 821.) Thus, for example, where there is independent evidence of flight as to which defendant's identity as the fleer is not in dispute, CALJIC No. 2.52 is proper. (*Ibid.*) *Anjell* has never stood for anything to the contrary.[4]

Applying these precepts, it is clear that the instruction here was justified. Bob Shabert testified that immediately after hearing a whooshing noise and

---

[3] Flight under these circumstances shows consciousness of guilt only if jury has resolved the issue of identity against the defendant. But where the jury makes this determination, the fact of flight does not assist their assessment of guilt. To imply that the act of fleeing somehow enhances the identification of defendant as the one who committed the crime is misleading. (*Anjell, supra,* 100 Cal.App.3d at p. 200.)

[4] *People* v. *London, supra,* 206 Cal.App.3d 896, concedes that a flight instruction should not be given where identity is the *only* issue in the case, apparently adopting the reasoning of *Anjell* itself. (*Id.,* at p. 903, citing *People* v. *Parrish* (1986) 185 Cal.App.3d 942, 948 [230 Cal.Rptr. 118].)

*Cowger, supra,* inaptly tries to dispose of *Anjell* by speculating that the fact the "robbers fled the scene" was not even evidence in the case, so that the identity language was inconsequential and the purest of dictum. (202 Cal.App.3d at p. 1076.)

*Simon, supra,* is on the right track in acknowledging that *Anjell* applies where the flight of the assailant is "identification neutral" as to the defendant. Yet it still follows the recent vogue by criticizing *Anjell* as unsound. (208 Cal.App.3d at p. 851.)

These intellectual gymnastics become unnecessary if one recognizes what *Anjell* holds implicitly—that the propriety of the instruction simply depends upon whether the evidence of defendant's flight is logically distinguishable from eyewitness testimony identifying him as the one who perpetrated the offense. What is unsound is not *Anjell* itself, but subsequent cases which have taken its holding out of context.

the sound of broken glass, he observed defendant running from the area of the Mickes' house. He and defendant ran into each other, and seconds later he noticed smoke coming from the house. Defendant never denied Shabert's testimony and in fact acknowledged that he and Shabert encountered each other near his property. Consequently, the jury could rationally draw a consciousness-of-guilt inference from defendant's actions, since defendant's flight from the vicinity of the crime scene at or near the inception of the fire truly did " 'connect an accused with the commission of an offense.' [Citation.]" (*Anjell, supra,* 100 Cal.App.3d at p. 199; see *People* v. *Hill* (1967) 67 Cal.2d 105, 112-113, 120 [60 Cal.Rptr. 234, 429 P.2d 586].)

Contrary to defendant's claim, the fact that he was seen running back toward his own residence does not affect the propriety of the instruction. Alternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury, not the court, to decide. (CALJIC No. 2.52; *People* v. *Sherren* (1979) 89 Cal.App.3d 752, 763 [152 Cal.Rptr. 828]; *People* v. *Remiro* (1979) 89 Cal.App.3d 809, 845 [153 Cal.Rptr. 89, 2 A.L.R.4th 1135].) We therefore reject defendant's claim of instructional error.[5]

### III-V*

. . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment of conviction is affirmed. For reasons expressed in the unpublished portion of this opinion, the case is remanded to the trial court with directions to resentence appellant in a manner consistent with that analysis.

Kline, P. J., and Benson, J., concurred.

A petition for a rehearing was denied May 26, 1989, and the opinion was modified to read as printed above.

---

[5] Defendant's subsidiary contention that the trial judge should have added further qualifying language to the instruction is also without merit. Penal Code section 1127c, from which CALJIC No. 2.52 is taken, expressly states that "No further instruction on the subject of flight need be given."

*See footnote, *ante,* page 1471.