Filed 6/23/25  P. v. Ross CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>AUBREY EMIKO ROSS,<br><br>        Defendant and Appellant. | A169265<br><br>(Humboldt County<br>Super. Ct. No. CR1605244) |

Defendant Aubrey Emiko Ross appeals from his robbery conviction and three-year prison sentence.  He contends that the trial court erred by (1) denying his request for an evidentiary hearing under *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*) so he could challenge the truthfulness of statements in a search warrant affidavit, (2) failing to state its reasons for denying probation, and (3) failing to impose the lower term.  We reject these contentions and affirm.

### BACKGROUND[1]

At approximately 4:00 a.m. on November 17, 2016, a man robbed the "cash cage" of the Cher-Ae Heights Casino (Casino) at gunpoint.  The robber

---

[1] Because Ross does not raise any issues relating to his trial, we omit the traditional statement of facts and provide only a brief description of the robbery and evidence.  To the extent that additional facts are relevant to specific issues raised on appeal, they are recounted in the discussion section.

1

wore "a black ski mask," "a black hoodie," "black Adidas pants," "black shoes," "black gloves," and a "black . . . backpack with the brown bottom."

Ross had the same height and build as the robber. The day before the robbery, Ross suddenly quit his job as a security guard for the Casino. He, however, returned to the Casino less than an hour after the robbery, asking for his job back. Roughly six to seven hours after the robbery, police discovered in the brush on the side of a road near the Casino "a black glove," "a black beanie," "a black . . . balaclava or face mask," and a "black quarter-zipped compression style shirt, long-sleeve." The mask contained Ross's DNA. And during its search of a bedroom in Ross's home pursuant to a warrant, police discovered a letter and mail addressed to Ross, a camouflage backpack, and a pink pillowcase with $27,000 in cash.[2]

The First Amended Information charged Ross with second degree robbery (Pen. Code, § 211)[3] and alleged that Ross personally used a semiautomatic handgun (§ 12022.53, subd. (b)). It further alleged multiple aggravating circumstances.

Following trial, the jury found Ross guilty of robbery (§ 211) but found not true the special allegation that Ross personally used a firearm in the course of the robbery (§ 12022.53, subd. (b)). As for the aggravating circumstances, the jury found that "[t]he crime involved great violence, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness," that "the manner in which the crime was carried

---

[2] At trial, Ross testified that he worked numerous jobs, including transporting marijuana, and was often paid in cash. He claimed that he kept his savings—approximately $70,000 in cash—at his home because he did not trust banks.

[3] All further statutory references are to the Penal Code.

out indicate[d] planning, sophistication, or professionalism," and that "[t]he crime involved an attempted or actual taking of great monetary value."

The trial court sentenced Ross to the midterm of three years in prison and imposed various fines and fees.

Ross filed a notice of appeal, which this court deemed to be timely under the constructive filing doctrine.

## DISCUSSION

### A. Search Warrant

Under *Franks*, *supra*, 438 U.S. at pages 155–156, a court must hold an evidentiary hearing (*Franks* hearing) if a defendant makes a "substantial preliminary showing" that an affiant, either deliberately or with reckless disregard for the truth, made false statements in a search warrant affidavit that were necessary for a finding of probable cause. Ross contends that he made this showing and should have received a *Franks* hearing. We disagree.

#### 1. *Facts*

On November 17, 2016, Humboldt County Investigator Scott Hicks submitted an affidavit in support of a warrant to search Ross, Ross's residence in Arcata, and Ross's car. Based solely on this affidavit, the trial court issued the warrant. The affidavit stated the following facts.

At 4:07 a.m. on November 17, 2016, a man, "covered from head to toe in black clothing wearing a camouflage backpack," entered the Casino and robbed its cash vault at gunpoint. The day before, Ross had quit his job as a "security officer" at the Casino "during the middle of his shift." Less than an hour after the robbery, Ross returned to the Casino to apologize for his resignation.

Casino employees "theorized" that the robber "had a similar physical stature" to Ross. After reviewing videos taken of the robber and Ross, Hicks

3

agreed. For instance, "[b]ased on the pictures on the wall that both [the robber and Ross] walked past," Hicks concluded that their heights "were about the same." Other "law enforcement officers" also "noticed that [Ross had] the same physical build as the male robber." And Casino "Surveillance Manager Robert Lanhan told Detective Turner that an employee witness . . . was able to determine [that the male robber] was [B]lack", like Ross.

According to "Eric Dumphey, a compliance officer" of the Casino, "the [robber's] black sweatshirt read 'ELITE' in white lettering." "A search of [Ross's] Facebook page revealed a photo of [Ross] wearing a sweatshirt that said 'ELITE' that matched the one worn by the male robber."

Finally, based on his experience working "closely with [Casino] personnel," Hicks opined that "someone employed as a security officer with" the Casino "would quickly obtain . . . knowledge of the casino operations."

Before trial, Ross moved to suppress the evidence obtained through the search warrant. In his motion, Ross asked for a *Franks* hearing based on two statements in Hicks's affidavit that he claimed were false: (1) a Casino employee identified the robber as African American, and (2) the robber's sweatshirt matched a sweatshirt that Ross wore in a Facebook post.

In support of his motion, Ross included an excerpt from the preliminary hearing testimony of Hicks. In that excerpt, Hicks testified that he matched the robber's sweatshirt in the Casino's surveillance videos to the sweatshirt Ross wore in a photo on his Facebook page. When defense counsel showed him the photo from Facebook, Hicks saw "a Nike Swoosh" and the letters "E" and "L" in "white lettering" on Ross's sweatshirt. But when counsel showed him a single still frame from the surveillance video, he could only see one "E" in "white lettering" on the robber's sweatshirt and could not see "a Nike Swoosh" from the "angle" he was shown.

4

In a written order, the trial court denied Ross's request for a *Franks* hearing. As to the skin color claim, the court found that (1) the affidavit's statement that the suspect was covered from head-to-toe in black clothing did not "exclude the possibility that the skin color of the suspect could have been observed," (2) "[m]ultiple levels of hearsay may be recited in an affidavit," and (3) "[t]he totality of the circumstances supports the reliability of [those] hearsay statements." As to the sweatshirt claim, the court found that Ross did not establish that Hicks's statement that "the sweatshirts 'matched' was false." As the court observed, the sweatshirts were "certainly similar."

At trial, Paul Rhodes, a security officer at the Casino, testified that another security officer, Michelle Mead, told him that she believed that the robber was "African-American" because she saw the "tone of his skin." Mead, however, testified that she did not see the robber's skin color.

2. *The Law*

A "defendant may challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1297.) If "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause," a court must conduct an evidentiary hearing known as a *Franks* hearing. (*Franks*, *supra*, 438 U.S. at pp. 155–156.) "Allegations of negligence or innocent mistake," however, "are insufficient." (*Id.* at p. 171.)

To obtain a *Franks* hearing, any "attack [on the veracity of statements in the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine." (*Franks*, *supra*, 438 U.S. at

5

p. 171.) Indeed, every request for a *Franks* hearing "must be accompanied by an offer of proof." (*Id*. at p. 171.) "Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." (*Ibid*.) "Because of the difficulty of meeting the 'substantial preliminary showing' standard, *Franks* hearings are rarely held." (*People v. Estrada* (2003) 105 Cal.App.4th 783, 790.)

We review the denial of a request for a *Franks* hearing de novo. (*People v. Sandoval* (2015) 62 Cal.4th 394, 410.)

3. *Analysis*

According to Ross, the trial court erred in denying his *Franks* motion because the search warrant affidavit contained two false statements: (1) the robber's skin color was "black," and (2) the robber's sweatshirt matched a sweatshirt worn by Ross in a photo. We find no error here because Ross did not make a substantial preliminary showing that these statements were false or made with reckless disregard for the truth.[4]

a. Skin Color

Ross contends that the affidavit's statement that a Casino employee identified "the robber's skin color as black" was "simply false." According to Ross, there was "no evidence then, or later, that any employee ever stated that he or she saw the robber's skin." Ross further contends that no employee could have seen the robber's skin because the robber was covered from "head to toe in black clothing." These contentions fall short of the showing needed for a *Franks* hearing.

---

[4] Because we affirm on this ground, we do not address Ross's argument that, without these statements, there was insufficient evidence to support a finding of probable cause for the search.

First, Ross has not made a substantial preliminary showing that the affidavit's statement about the robber's skin color was false. Rhodes, a Casino employee, testified at trial that Mead, a Casino employee who witnessed the robbery, told him that she noticed the robber's "African-American" skin color. That Rhodes may have misheard Mead does not mean that the statement in the affidavit—that a Casino employee who witnessed the robbery told another Casino employee that the robber was African American—was false.[5] (See *People v. Benjamin* (1999) 77 Cal.App.4th 264, 274 (*Benjamin*) [" 'Allegations that statements reported in the affidavit and made to the affiant are false are not sufficient to satisfy the requirements for a *Franks* hearing unless the defendant contends that the affiant has misrepresented the statements made by another.' "].)

Second, Ross did not make the requisite "offer of proof" in his pretrial *Franks* motion as to his skin color claim. (*Franks*, *supra*, 438 U.S. at p. 171.) He did not furnish any "[a]ffidavits or sworn or otherwise reliable statements of witnesses" or provide any explanation for "their absence." (*Ibid.*) Instead, he relied solely on the affiant's statement that the robber was covered from "head to toe in black clothing" to support his claim that the Casino employee's identification of the robber's skin color was false. But as the trial court correctly noted, this statement did not establish that the employee could not have seen the robber's skin color. For example, the robber's clothing may have shifted as he moved, revealing his skin color. Without any other evidentiary support, Ross's claim that no witness saw the robber's skin color amounted to "conclusory contradictions of the affiant's statements"

---

[5] Any misidentification in the affidavit of the Casino employee who relayed this information is immaterial because it had no bearing on the probable cause determination. (*Franks*, *supra*, 438 U.S. at p. 171.)

7

insufficient to trigger a *Franks* hearing. (*Benjamin*, *supra*, 77 Cal.App.4th at p. 272.)

That Ross could not have included evidence from the trial in his pretrial motion does not help him on appeal because he could have renewed that motion at trial based on "subsequently discovered evidence." *Benjamin* does not hold otherwise. In *Benjamin*, the Court of Appeal explained that evidence discovered after the execution of the search warrant may be used to attack or corroborate representations in a warrant affidavit. (*Benjamin*, *supra*, 77 Cal.App.4th at p. 276.) It did not absolve Ross of his duty to raise that evidence in a timely manner.

Third, the trial court did not err in holding that "[m]ultiple levels of hearsay may be recited in an affidavit."

In *Illinois v. Gates* (1983) 462 U.S. 213, 217 (*Gates*), the United States Supreme Court considered whether hearsay statements from an informant were sufficient to establish probable cause for a search warrant. In answering this question, the high court rejected the two-pronged test mentioned by Ross in his opening brief (*id*. at p. 233) in favor of a totality of the circumstances test (*id*. at pp. 238–239). Under that test, courts balance "the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip." (*Id*. at p. 234.) In doing so, the courts' task is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the court], including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Id*. at p. 238.) If an "informant's statement is reasonably corroborated by other matters within the officer's

knowledge," an affidavit relying on hearsay is "not to be deemed insufficient on that score." (*Id*. at pp. 241–242.)

Here, there was no reason for Hicks to doubt the veracity of any investigator or Casino employee who relayed that another Casino employee had identified the robber as African American based on his skin color. Indeed, the hearsay statements in the affidavit about the robber's skin color appear more reliable than the "anonymous handwritten letter" in *Gates*. (*Gates*, *supra*, 462 U.S. at p. 225.) In any event, the statements were reasonably corroborated by the physical similarities between the robber and Ross as well as the oddity of Ross's return to the casino the day after he suddenly quit and less than an hour after the robbery.

Finally, Ross asserts that the trial court used the wrong burden of proof. But our review here is de novo, and based on our de novo review, we find that Ross failed to make the requisite showing under the correct burden of proof.

### b. Sweatshirts

Ross contends that Hicks was "[r]eckless" in stating that the robber's sweatshirt matched the one worn by Ross in a Facebook photo because "they were *not* the same sweatshirts." We disagree.

As a threshold matter, Ross has not made a substantial preliminary showing that the two sweatshirts did not match. Even Ross admits that the two sweatshirts were similar. Both were black and had white lettering across the chest. The sweatshirt worn by Ross in the Facebook photo contained the word "Elite" "across the chest" and Hicks identified the letter "E" in the same location on the robber's sweatshirt. The only alleged discrepancy between them—the absence of a Nike "Swoosh" on the robber's sweatshirt—is tenuous at best. The sole evidence of that discrepancy comes

9

from Hicks's testimony that he could not see a "Swoosh" on the robber's sweatshirt from the angle of the only still frame of video that defense counsel showed him. Because Ross presented *no* evidence that a "Swoosh" should have been visible from the surveillance videos of the robbery or that Hicks was unable to see a "Swoosh" in those videos, the evidence cited by Ross is not enough to trigger a *Franks* hearing.

Even assuming that this discrepancy did exist, Hicks was not reckless in stating that the two sweatshirts matched. Although the affidavit does not explicitly state that Hicks "personally" matched the two sweatshirts, we can reasonably infer from the affidavit that Hicks did so. Indeed, Hicks stated that he not only watched several videos of the robber, he also found the photo of Ross wearing the sweatshirt on Facebook. He also testified at the preliminary hearing that he "mentally compared them." Thus, even if Hicks erred in matching the two sweatshirts, he was, at most, negligent. (See *Franks*, *supra*, 438 U.S. at p. 171 [negligence is insufficient to justify a *Franks* hearing].)

## B. Sentencing Issues

According to Ross, the trial court abused its discretion when it sentenced him to the midterm of three years. (See *People v. Fredrickson* (2023) 90 Cal.App.5th 984, 988 [sentencing decision is reviewed for abuse of discretion].) First, he contends the court failed to state its reasons for denying probation. Second, he contends the court failed to apply the statutory presumption in favor of the lower term. We reject both contentions.

### 1. *Ross's Sentencing*

In its presentence report, the probation department stated that Ross was ineligible for probation "[e]xcept in the case of an unusual circumstance" because "he used a firearm during the commission of a robbery."

(§ 1203, subd. (e)(1).)  Finding no unusual circumstances, the department recommended that Ross be sentenced to the upper term of five years.

In his presentence statement in mitigation, Ross disagreed with the probation department, explaining that he is "statutorily eligible for probation" because "he has not been convicted of any enhancement that would render him ineligible" and because there is no "statutory prohibition" under sections 1203.06 to 1203.09.  He then argued for probation.  In the alternative, Ross argued that, because of his youth, he should receive the lower term under the presumption established by section 1170, subdivision (b)(6).

Despite Ross's written request for probation, neither party mentioned probation at the hearing.  The trial court did, however, state that it had reviewed the probation report—which identified the circumstances in aggravation and mitigation—and Ross's statement in mitigation and letter to the court.

Upon announcing its tentative decision to sentence Ross to the midterm, the trial court acknowledged that Ross "may have had a very difficult and challenging, if not, tragic childhood."  It also observed that "there is a statute that says that in considering age, the [c]ourt should consider a lower sentence."  The court, however, explained that the evidence that Ross committed the robbery "was overwhelming."  It then expressed concern that Ross maintained his "factual innocence" despite this overwhelming evidence, his betrayal of "trust and friendships," and the traumatic impact of his robbery on the victims.  Indeed, the court emphasized that Ross "accepted no responsibility" for his crime.  Moreover, the court did not "disagree" with the prosecution's statement that Ross's conduct was "especially infuriating" because "he believed that he could get away with it,"

11

"went back to the scene to check it out," lied "to the police," "committed perjury during the trial," and continued to maintain his innocence. It also did not "disagree" that Ross appeared to "view himself as the victim here," had "shown that he will engage in violent conduct in order to get an advantage in his life," and therefore presented "a continued threat to public safety." Considering both "the aggravation and mitigation," the court suggested that Ross should receive the "upper term" as recommended by the probation report and prosecution. But because this was Ross's "first offense" and because he would be supervised after serving his sentence, the court concluded that "the appropriate legal term is the midterm"—and "not the low term." The court therefore sentenced Ross to the midterm of three years.

    2. *Denial of Probation*

Ross argues that remand is necessary because the trial court failed to state its reasons for denying probation as required by section 1170, subdivision (c).[6] We disagree.

As a threshold matter, we find that Ross forfeited this argument by failing to raise it at the sentencing hearing. Citing *People v. Salazar* (1980) 108 Cal.App.3d 992, 1001, footnote 4 (*Salazar*), Ross contends that the forfeiture doctrine does not apply here. *Salazar,* however, predates *People v. Scott* (1994) 9 Cal.4th 331, 356 (*Scott*)—in which our high court held "that complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal" and "disapprove[d] any contrary view or holdings expressed by the Courts of Appeal." That Ross argued for probation in his presentence

---

[6] Section 1170, subdivision (c) states in relevant part that "[t]he court shall state the reasons for its sentence choice on the record at the time of sentencing."

12

statement did not absolve him of his duty to object at the hearing because the trial court had to "state the reasons for its sentence choice . . . *at the time of sentencing*." (§ 1170, subd. (c), italics added.) Ross therefore forfeited his challenge based on the court's failure to state its reasons for denying probation. (See *People v. Morales* (2008) 168 Cal.App.4th 1075, 1084 ["by failing to raise it in the trial court," the defendant forfeited claim that the "court erred" by failing "to state on the record its reasons for its sentencing choice"].)

Even if Ross had not forfeited the argument, it fails on the merits.

First, the trial court's silence on probation does not support a remand. Although the probation report stated that Ross was ineligible for probation, Ross explained why he was eligible for probation in his statement in mitigation that the court reviewed. Because "the record is silent concerning whether the . . . court misunderstood its sentencing discretion," no error may be presumed. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1229.)

Second, the reasons given by the trial court for imposing the midterm satisfy section 1170, subdivision (c). This is because "the denial of probation is implicitly explained from the judge's choice in levying jail as a sentence choice." (*People v. Ramos* (1980) 106 Cal.App.3d 591, 599, disapproved on other grounds by *Scott, supra*, 9 Cal.4th at p. 353, fn. 16; see *People v. Hawthorne* (1991) 226 Cal.App.3d 789, 792, fn. 2 (*Hawthorne*) ["the denial of probation . . . is part and parcel of the concomitant decision to sentence to state prison"].) Thus, when a court states its reasons "for imposing a midterm sentence," "[r]easons for denying probation have been held to be unnecessary . . . ." (*People v. Cushway* (1987) 193 Cal.App.3d 776, 779–780; see also *People v. Crouch* (1982) 131 Cal.App.3d 902, 904 ["The court should have stated on the record why it chose to sentence defendant to prison. This

13

could have been done directly with explicit reasons or indirectly by stating why probation was deemed inappropriate."].)  Because the court gave ample reasons on the record for its decision to impose the midterm and because Ross does not challenge those reasons, the court did not err by failing to repeat those reasons in denying probation.[7]  (*People v. Pennington* (1989) 213 Cal.App.3d 173, 177 ["The reasons for denying probation are the reasons for selecting a . . . prison sentence, and need not be stated twice"].)

Finally, even if the trial court erred by failing to state its reasons for denying probation, that error is harmless.[8]  (*People v. Romero* (1985) 167 Cal.App.3d 1148, 1151–1152 (*Romero*) [failure to state reasons for denying probation was harmless]; *People v. Mobley* (1983) 139 Cal.App.3d 320, 324–325 [same].)  At the sentencing hearing, the court stated that the upper term was arguably justified and expressly rejected the lower term based on the relevant factors.  Accordingly, "it is not reasonably probable that a different result would have occurred had the court articulated reasons for" denying probation.  (*Mobley*, at pp. 325.)

None of the cases cited by Ross suggest otherwise.  In *People v. Arceo* (1979) 95 Cal.App.3d 117, 121, the trial court "did not state reasons for the prison sentence" *or* the denial of probation.  The same is true in two other cases he cites.  (See *Hawthorne, supra,* 226 Cal.App.3d at p. 792 ["the trial

---

[7] In the past, "courts were divided over the question whether the denial of probation is a 'sentence choice' for purposes of" section 1170, subdivision (c).  (*People v. Bowen* (1992) 11 Cal.App.4th 102, 105, fn.1.)  Rule 4.406(b)(2) of the California Rules of Court now establishes that "[d]enying probation when the defendant is presumptively eligible for probation" is a "sentence choice[] that generally require[s] a statement of a reason . . . ."

[8] Although Ross correctly notes that the People did not argue harmless error, we are not bound by any concession made by the People if we disagree with it.  (*People v. Hawkins* (2012) 211 Cal.App.4th 194, 202 [disagreeing with position taken by the Attorney General on forfeiture].)

court decided to deny probation and sentence defendant to state prison: no statement of reasons was given"]; *Salazar, supra,* 108 Cal.App.3d at p. 1000, fn. 3 ["the denial of probation here was followed by imposition of the middle term and no statement of reasons was given . . . for [the] disposition"].) Meanwhile, in *People v. Haynes* (1984) 160 Cal.App.3d 1122, 1138, the Court of Appeal simply held that the trial court did not have to state its reasons for imposing the midterm when it had already stated its reasons for denying probation. And in *People v. Jackson* (1987) 196 Cal.App.3d 380, 389–390, the Court of Appeal reversed the imposition of the upper term. As a result, it never considered whether the reasons given for the prison sentence satisfied section 1170, subdivision (c). Finally, in *Romero, supra,* 167 Cal.App.3d at page 1151, the Court of Appeal never considered whether the trial court adequately stated its reasons for imposing the prison sentence. In any event, the sentencing error in *Romero,* like the purported error in this case, was harmless. (*Ibid.*) Thus, remand is not warranted.

3. *Failure to Impose the Lower Term*

Under section 1170, subdivision (b)(6), "the court shall order imposition of the lower term," "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [and] imposition of the lower term would be contrary to the interests of justice," if "[t]he person has experienced psychological, physical, or childhood trauma" (§ 1170, subd. (b)(6)(A)) or if "[t]he person . . . was a youth . . . at the time of the commission of the offense" (§ 1170, subd. (b)(6)(B)). Ross contends that the trial court abused its discretion by failing to apply this presumption. We disagree.

First, we must presume that the trial court was aware of the presumption because Ross cited section 1170, subdivision (b)(6) in arguing for a lower term in his statement in mitigation. For this reason alone, we

15

conclude that the court correctly applied it.  (See *People v. Caparrotta* (2024) 103 Cal.App.5th 874, 905 (*Caparrotta*) ["nothing in the record establishes that the trial court . . . failed to apply" the lower term presumption even though the court failed to mention section 1170, subdivision (b)(6) because the defendant "highlighted . . . section 1170, subdivision (b)(6) in his sentencing memorandum"].)

Second, the trial court appeared to apply the presumption when it stated at the sentencing hearing that due to Ross's age, it "*should* consider a lower term" based on "a statute."  (Italics added.)  Indeed, the court stated that it "weigh[ed] all of the laws that are required to be weighed"—which presumably included section 1170, subdivision (b)(6).  To the extent that the court's statements are ambiguous, we presume that it was " 'aware of and followed the applicable law.' "  (*People v. Martinez* (1998) 65 Cal.App.4th 1511, 1517.)

Finally, the trial court's failure to "expressly state . . . that 'imposition of the lower term would be contrary to the interests of justice' " does not support reversal.  (*Caparrotta, supra*, 103 Cal.App.5th at p. 906, fn. 14.)  Where, as here, the court "indicated at the sentencing hearing that it had expressly weighed the aggravating and mitigating circumstances, and that, as a result, it had decided to impose a middle-term sentence," Ross has failed to establish an abuse of discretion.  (*Id*. at p. 906.)

## DISPOSITION

The judgment is affirmed.

CHOU, J.


WE CONCUR:


SIMMONS, ACTING P. J.

BURNS, J.


A169265
*People v. Ross*