Filed 6/10/25  P. v. Koehler CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>ROBERT WILLIAM KOEHLER IV,<br><br>　　Defendant and Appellant. | 2d Crim. No. B326685<br>(Super. Ct. No. 18F-04199)<br>(San Luis Obispo County) |

　　Robert William Koehler IV appeals following a trial at which a jury convicted him of first degree murder (Pen. Code, §§ 187, subd. (a), 189).  The jury also found true an enhancement for personal use of a deadly or dangerous weapon (knife or sharp cutting instrument) (*id*., § 12022, subd. (b)(1)).  In a bifurcated proceeding, appellant admitted a prior conviction (*id*., § 215, subd. (a) (carjacking)) that qualified as both a strike and serious felony prior (*id*., § 667, subd. (a), (d), & (e)).  The court sentenced appellant to a total of 56 years to life in prison.

Appellant contends the court erred: (1) under Evidence Code section 352.2[1] by admitting appellant's fictional writings, poetry, and rap lyrics; (2) in denying a new trial motion based on newly discovered evidence, which appellant claims the prosecutor failed to promptly turn over in violation of his rights; (3) by instructing on flight pursuant to CALCRIM No. 372; and (4) in denying his request for a continuance to obtain a witness's testimony. Appellant also asserts cumulative prejudice. We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Prosecution Case*

On January 9, 2018, Kristen Marti and appellant arranged to meet. According to the prosecution, appellant "targeted [Marti] as a prostitute, plied her with tiletamine-laced cocaine . . . slit her throat, and then . . . put rocks on top of her in Prefumo Canyon hoping nobody would ever find her."

Marti had been Nickolas Reed's girlfriend for about six years in January 2018. In a typical day, they would "wake up, do some heroin and maybe meth[amphetamine], and then try to get more." Cocaine was too expensive for them.

On January 9, 2018, Marti and Reed met their friend Phil Furia and all three used heroin. Reed saw Marti trying to set up a date on Craigslist. At around 6:00 p.m. while parked in Furia's vehicle near Santa Rosa Park, Marti abruptly jumped out of the car and left without saying anything. Furia saw Marti walk toward a nearby parking lot.

At 6:39 p.m., Marti sent Reed a text message indicating she was on Prefumo. Furia drove Reed to Prefumo Canyon, where

---

[1] Unless otherwise indicated, undesignated statutory references are to the Evidence Code.

they walked up and down the street. Reed saw Marti inside a red or maroon vehicle. Furia did not see who was in the car and had described the car differently. Reed heard a voice say, "Get away from the car." Reed did not want to upset Marti by interfering, so he and Furia left.

Reed later met up with friends, including Brent Perucca. Reed testified Perucca drove him back to the same spot on Prefumo Canyon, and Reed saw no one there. Perucca denied going to Prefumo Canyon Road with Reed but testified they spent time together that evening. Both testified they drove to Perucca's residence, where Perucca went into the apartment around 12:45 a.m. and Reed slept in the car.

Appellant began a messaging conversation with Marti on December 12, 2017. They discussed meeting, and Marti asked about a "donation," code for payment for prostitution. On January 2, 2018, appellant asked if Marti wanted to do some cocaine. On January 3, Marti again asked about a donation as they discussed meeting.

At around 3:00 p.m. on January 9, 2018, Heather Dwyer and appellant met at a parking lot after Dwyer responded to appellant's help wanted ad. The encounter became a "hookup," and they attempted to have sex in appellant's vehicle. Appellant appeared to be under the influence of methamphetamine. After about 60 to 90 minutes, appellant dropped Dwyer off.

Just after 5:00 p.m. on January 9, appellant messaged Marti asking if she wanted to "have some fun and do some go fast." According to Sergeant Caleb Kemp, "go fast" referred to either cocaine or methamphetamine. They decided to meet at Santa Rosa Park. Marti asked if appellant had her donation. Appellant replied, "Yes of course." At 6:16 p.m., Marti indicated

3

her friends were dropping her off at a gas station. Appellant said he was in a red Toyota truck.

Brianna Koehler was appellant's wife. January 9 was the anniversary of when they met. Appellant was supposed to pick Brianna up from work but did not. She called but could not reach him.

Phone records showed Brianna called appellant at 7:03 p.m. and that the call could have gone to voicemail. For this call, appellant's phone communicated with a cell tower sector covering Prefumo Canyon. A health application on appellant's phone recorded two flights climbed at 8:35 p.m. At 9:11 p.m., Brianna sent the following text message: "Happy anniversary. Good night."

Phone records indicated appellant did not read that message until 9:56 p.m. The records also showed five calls from Brianna to appellant between 9:33 p.m. and 9:56 p.m., all of which went to voicemail because no cell tower could find his phone. At 9:56 p.m., appellant sent Brianna a message indicating he had just finished at the gym and would be home soon.

Brianna went to sleep and woke up next to appellant the following morning.

On January 10, Reed checked hangout spots, hospitals, and jails looking for Marti. Phone and Facebook records showed Reed made numerous attempts to contact Marti after her disappearance. On January 18, Reed filed a missing person's report.

Reed testified Marti struck him "[a] lot." Reed indicated he struck her once, resulting in a bloody nose. Perucca testified he had to interrupt physical altercations between Reed and Marti. Another woman told police Reed struck her, choked her, and

4

pulled her out of the car by her hair. That woman later recanted, and Reed pled to misdemeanor domestic assault. At Marti's trial, Reed denied the woman's accusations.

On March 25, 2018, law enforcement searched Prefumo Canyon. With the help of a cadaver dog, Marti's body was found in a creek near the road. She was partially covered by rocks; about mid-torso up was visible. The rocks appeared movable by a single person and placed on top of her to hold her in the water. An investigator who walked from the roadway edge to the location of Marti's body and back a total of ten times recorded six flights gained on the phone health application.

An autopsy showed Marti died from sharp force injury to her neck. The manner of death was homicide.

Initial toxicology results indicated Marti's body contained cocaine, methamphetamine, morphine, codeine, and a compound associated with heroin use. Subsequent testing of her sample revealed tiletamine at .008 milligrams per liter.

In reviewing appellant's phone, law enforcement found a bookmark on an e-commerce website for the drug Telazol. Appellant's laptop also contained a reference to Telazol. Telazol is an anesthetic drug comprised of tiletamine and zolazepam. Tiletamine is a dissociative anesthetic that can cause immobility, amnesia, and pain relief. Tiletamine is designated for animal use. If a 170-pound woman snorted a crushed Telazol pellet, fairly rapid loss of mobility and consciousness would ensue.

A toxicologist from a large commercial laboratory found only one reported case of tiletamine in their database for about 360,000 blood samples tested between 2014 and 2021.

Law enforcement linked the phone number appellant used to message Marti to an account owner named John Hill. The

account was associated with a Gmail account. The Gmail account had an end service date of January 9, 2018 at 11:06 p.m.

Alisha Padilla testified she knew appellant as John Hill. In 2017, Padilla answered appellant's "sugar baby" ad. She once had a sexual encounter with appellant along Prefumo Canyon Road. Another time, appellant gave her an open beer. After drinking part of it, Padilla felt bubbly, sluggish, and intoxicated.

M. Lopez met appellant on Tinder, a dating app and website, in late 2017 and knew him as John. Appellant asked her to get him cocaine multiple times. Appellant said he was going to use it for a "special occasion." In early January 2018, Lopez got him $100 worth of cocaine. He did not use it in front of her.

Search of a storage shed at appellant's residence uncovered hundreds of writings. Lieutenant Chad Pfarr characterized some of the writings as "[e]xceptionally sadistic, evil, [and] frightening . . . ." One part read: "I plan to spend time in an electrical chair fryin [sic], this is your house but now that I'm in I have visions of opening your body with incisions, . . . with percision [sic] inflict laserations doin [sic] it slow . . . ." Another read: "im similar to Jack the ripper, Except I hide the huffin rag And crack pipe in my slippers . . . ."

The writings also included a document entitled, "Steps to Avoid Getting Pinched." It listed tactics to avoid getting caught committing a crime, such as carrying minimal personal effects, wearing long sleeves to avoid leaving fingerprints, and shaving off body hair.

Appellant spoke with law enforcement multiple times. On February 22, 2018, when shown two photos of Marti, appellant said he did not recognize either one. After being told phone location data connected him to Marti, he admitted to meeting her. Appellant said he dropped her at a bus stop near Madonna Plaza.

6

Appellant said he was driving his Nissan 300 ZX. Law enforcement drove appellant to Prefumo Canyon. When told he had been seen there, appellant said, "We drove by it but I wasn't over like on that road." Appellant said he stopped outside of Prefumo Canyon on Los Osos Valley Road for about two minutes.

In a May 31, 2018 interview, appellant said he drove Marti in his red Chevy Blazer and that his vehicle broke down on Los Osos Valley Road at Prefumo Canyon for about an hour to 90 minutes. Marti left the car and walked up Prefumo. When law enforcement brought up Telazol, appellant knew it was for pets and used to "mellow them out." Appellant said he looked into it for a friend whom he declined to name. Appellant denied getting the drug.

Darrell Friday, a friend of appellant's, once had a pit bull. Friday and appellant would hang out and play with the dog. In late 2015 or mid-2016, Friday gave the pit bull to a friend due to its barking. When he and appellant later visited that friend, the pit bull became excited and tried to tear off the ceiling fan. Friday never requested that appellant get Telazol or tiletamine to calm his dog down, and he did not recall appellant ever talking about those drugs.

Facebook showed appellant's Blazer was listed for sale at $4,000 and $3,500 on September 10, 2017. A page dated January 27 listed the Blazer for $1,000. John Hernandez testified he bought appellant's Blazer for $600. Appellant gave him a catalytic converter still in the box. Hernandez had the converter installed for $65 and sold the car for $1,250 within a day or two.

In March 2018, law enforcement searched appellant's Blazer. They found a methamphetamine pipe underneath the center console. A chemical that reacts to blood reacted to the

7

Blazer's trunk cargo area, back seat, and a little piece of the driver's seat.

*Defense Evidence*

In 2014 or 2015, appellant's sister Alisha Prince lived with her mother and appellant near Darrell Friday. Friday had a high-strung, energetic pit bull that destroyed Prince's tetherball. Appellant loved the dog and wanted to adopt it, but their mother refused.

In 2018, Prince lived with her mother, appellant, and Brianna on Ash Street. Prince recalled Brianna made an anniversary dinner on January 9. Before going to bed, Brianna told Prince that appellant was at the gym. Brianna went to bed at around 10:00 p.m. or 11:00 p.m., or maybe slightly earlier. Appellant came home a little while after. He set his tools down and went upstairs. He was not soaking wet, nor was he covered in blood or mud.

Defense investigator Ernest Romero testified to a portion of appellant's writings. In a letter to Marshall Mathers, also known as Eminem, appellant indicated he writes rap lyrics. Appellant further indicated he included a sample, Rant #6. A part of the letter read: "'All lyrics Fictional, made up and make believe. I exercise my 1st amendment of speach [sic]. These arent [sic] to be taken seriously, just song lyrics.'"

Marti's father once saw her with a bloody nose, and she indicated Reed had struck her.

A hydrology and hydraulics expert testified to the water flow in Prefumo Canyon Creek at various times in the evening and night of January 9, 2018.

Telecommunications expert Thomas Blackburn testified about the possible locations of appellant's and Marti's cell phones on January 9, 2018.

*Rebuttal Evidence*

The People's expert testified phones do not always connect to the closest cell towers, and he criticized Blackburn's conclusions.

DISCUSSION

*Admission of Appellant's Writings*

Appellant argues the "trial court committed error under Evidence Code section 352.2 when it granted the prosecutor's request to admit appellant's fictional writings, poetry, and rap lyrics." We conclude section 352.2 does not apply retroactively to this case. Regardless, any error in admitting the writings was harmless.

Between appellant's trial and sentencing, the Legislature added section 352.2. (Stats.2022, ch. 973, § 2 (A.B. 2799), eff. Jan. 1, 2023.) Section 352.2 applies "[i]n any criminal proceeding where a party seeks to admit as evidence a form of creative expression . . . ." In such cases, courts must consider additional factors when balancing under section 352—specifically, that: "(1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (§ 352.2, subd. (a).) Section 352.2 also details the evidence courts must consider in ruling, defines "creative expression," and sets forth procedural rules. (*Id.*, subds. (b)-(d).)

"Ordinarily, statutes are presumed to apply only prospectively, unless the Legislature expressly declares otherwise. This well-settled principle is codified at section 3 of the Penal Code and appears in other codes as well." (*People v. Burgos* (2024) 16 Cal.5th 1, 7-8 (*Burgos*).) However, "[w]hen new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 673; *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).)

Our Supreme Court's recent *Burgos* opinion clarified the contours of *Estrada*'s retroactivity inference. The *Burgos* Court held that inference did not apply to Penal Code section 1109, which provides for bifurcation of gang charges. (*Burgos*, *supra*, 16 Cal.5th at pp. 7-8.) The Court reasoned "*Estrada*'s principle of statutory interpretation infers retroactivity from statutory reductions in punishment, not from the type of prophylactic rules of criminal procedure embodied in section 1109's bifurcation provisions." (*Id*. at p. 8.) *Estrada* does not apply to "new legislation that modifie[s] aspects of how criminal cases are investigated or tried." (*Id*. at p. 15, fn. omitted.)

Like Penal Code section 1109, section 352.2 is a prophylactic rule of criminal procedure that impacts the conduct of trials. Section 352.2 does not reduce or create discretion to reduce punishment, nor does it narrow the scope of criminal liability. (*Burgos*, *supra*, 16 Cal.5th at p. 16.) Two of three published cases to consider the question have concluded section 352.2 is not retroactive. (*People v. Slaton* (2023) 95 Cal.App.5th 363, review granted Nov. 15, 2023, S282047; *People v. Ramos* (2023) 90 Cal.App.5th 578, review granted July 12, 2023, S280073; but see *People v. Venable* (2023) 88 Cal.App.5th 445, review granted May 17, 2023, S279081.) *Venable*, the only

10

published case to hold section 352.2 retroactive, relied on the majority appellate opinion in *People v. Burgos* (2022) 77 Cal.App.5th 550, which our Supreme Court reversed in *Burgos*, *supra*, 16 Cal.5th 1. With the benefit of the Court's *Burgos* opinion, we conclude section 352.2 is not retroactive and reject appellant's claim.

But even assuming section 352.2 is retroactive and the court erred in admitting the challenged writings, any error was harmless because it did not constitute a due process violation rendering appellant's trial fundamentally unfair, nor is there a reasonable probability of a different outcome absent the error. (See *People v. Partida* (2005) 37 Cal.4th 428, 439; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

A raft of circumstantial evidence identified appellant as the perpetrator. Phone data connected appellant and Marti leading up to and on the day of her disappearance. Then, late that night, service was ended for a Gmail account associated with the messaging application he used to contact Marti. After the murder, appellant sold his Blazer for a much lower price than had been previously listed. This behavior indicates a concerted effort to erase any link between Marti and appellant.

Appellant gave law enforcement inconsistent statements that seemed progressively tailored to fit the evidence against him. He initially denied recognizing Marti. He also indicated he was in a different vehicle and parted ways with her at a different location. Appellant's evolving account betrayed his true conduct.

Appellant's phone had a bookmark on an e-commerce website for Telazol, which includes tiletamine—an animal anesthetic. Tiletamine is very rarely found in human blood samples. Yet, a forensic toxicologist found it in Marti's sample. During an interview, appellant evinced knowledge of Telazol.

11

Appellant highlights the danger the writings could be used as improper character evidence, as well as the prosecutor's emphasis on the writings in closing argument. Although the prosecutor discussed appellant's writings at some length, her closing argument generally undertook a detailed review of the evidence. The writings were far from the sole focus. Moreover, the abstract risk that the jury could misuse the evidence does not persuade us. Appellant's letter to Mathers, in which he indicates his lyrics are not to be taken seriously, reduced that risk. Given the strength of the evidence against appellant, any error in admitting the writings was harmless.

### Marti's Journal

Appellant contends the court erred in denying his motion for a new trial based on newly discovered evidence—namely, Marti's journal. Appellant further claims the failure to promptly turn over Marti's journal violated *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*), depriving him of "his rights to due process of law, to a fair trial, to present a complete defense, and to the effective assistance of counsel." We disagree.

### 1. *Additional Factual and Procedural Background*

About three weeks into trial testimony, appellant's counsel cross-examined Sergeant Kemp regarding Marti's journal. Kemp said he was unaware of its existence. In a 2018 letter, Marti's mother stated she found two journals—one Reed's, the other Marti's—and took both to Kemp. The letter stated Marti's mother later returned Reed's journal to SLO Green Clean, where she had found both journals.

Kemp denied receiving Marti's journal[2] from her mother. Marti's journal was, however, found in the police evidence room and had not been previously discovered to the defense. Detective Chastain had booked the journal into evidence. Chastain had authored a search warrant for Green Clean. One of the items seized was a composition book—Marti's journal. Kemp testified the journal contained pay-owe sheets with names and numbers listed, as well as men's names and phone numbers.

Appellant's counsel contended the journal warranted a new trial. Counsel argued the men's names with phone numbers could have led to numerous potential witnesses. Counsel also cited some of Marti's writings about Reed, including: "[T]he way we hurt eachother [sic] is far more fucked up then [sic] some tweaked out drug dealer getting a hard on for me and letting out all his sadistic sexual urges out on me." After indicating such statements were inadmissible hearsay, the court denied the new trial motion.

### 2. *Analysis*

""""To grant a new trial on the basis of newly discovered evidence, the evidence must make a different result probable on retrial." [Citation.] "[T]he trial court has broad discretion in ruling on a new trial motion . . . ," and its "ruling will be disturbed only for clear abuse of that discretion."""" (*People v. O'Malley* (2016) 62 Cal.4th 944, 1016; Pen. Code, § 1181, subd. (8).) "'In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be

---

[2] The journal was a composition book with "Nick and Kristen's journal" on the front. For simplicity, we refer to it as Marti's journal.

newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.”’” (*People v. Howard* (2010) 51 Cal.4th 15, 43.)

The trial court did not abuse its discretion in denying the new trial motion. Marti's journal was discovered during trial through the efforts of appellant's counsel. Thus, appellant could—and did—elicit the journal's contents at trial. Counsel established the existence of pay-owe sheets and men's phone numbers in the journal. Marti's statements regarding her relationship with Reed were hearsay; the journal's belated discovery did not impact the admissibility of those statements. While the names and phone numbers in the journal could have theoretically led to further evidence, such speculation does not show that a different result would be probable on retrial.

Appellant's *Brady* claim likewise fails. “There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.” (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 [144 L.Ed.2d 286].) In *People v. Mora and Rangel*, our Supreme Court held that “[e]vidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery.” (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467 (*Mora*).) *Mora* looked to federal circuit precedent “explaining that when considering whether delayed disclosure rather than ‘total nondisclosure’ constitutes a *Brady* violation, ‘the applicable test

14

is whether defense counsel was "prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case."'" (*Ibid.*, quoting *U.S. v. Devin* (1st Cir. 1990) 918 F.2d 280, 289.)

*Brady* claims are subject to independent review. (See *People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

The delayed disclosure here did not prejudice appellant. As explained above, appellant's counsel elicited admissible information from the journal, and any contention regarding further investigative leads is speculative. Furthermore, in closing argument, counsel used the late discovery to attack law enforcement's credibility. Counsel also told the jury he "had no time [to] look at any of this." The delayed disclosure did not prevent counsel from using the journal to effectively prepare and present appellant's case.

*CALCRIM No. 372 Flight Instruction*

Appellant contends the court erred by instructing on flight pursuant to CALCRIM No. 372.[3] We disagree.

*1. Additional Factual and Procedural Background*

According to Brianna Koehler, a law enforcement search at their residence on Ash Street prompted their landlord to ask them to move. Appellant and Brianna moved to Clarkie Way, and the lease began March 1, 2018. They paid about $5,000 as part of the move. Law enforcement executed a search warrant at Clarkie Way on April 30. Shortly after the search, appellant left

---

[3] The court instructed per CALCRIM No. 372: "If the defendant fled after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

15

the area.  Brianna testified the Clarkie Way landlord asked them to leave.  They decided to go to Michigan, where Brianna's best friend lived.

According to an investigator who interviewed the Clarkie Way landlord, appellant was a good tenant with whom he had an open line of communication.  At one point, the landlord went to the residence to check on appellant, and appellant's mother advised he "had to take off on an emergency."  After learning of appellant's arrest, the landlord cleared out the residence, which still contained abundant personal property.

In May 2018, law enforcement arrested appellant when he was with Brianna in Minnesota.  An investigator testified "[i]t looked like they had gathered as much stuff as they could and hit the road."

During a discussion of jury instructions, appellant's counsel informed the court that appellant had consulted with another attorney, Jere Sullivan, during the investigation.  According to appellant's counsel, Sullivan contacted an assistant district attorney and indicated he would arrange for appellant's voluntary surrender if charged.  The prosecutor acknowledged a call occurred "[a]t some point."

### 2. Analysis

A flight instruction "is statutorily required when flight evidence is relied upon by the prosecution." (*People v. Howard* (2008) 42 Cal.4th 1000, 1020 (*Howard*); Pen. Code, § 1127c.)  ""In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citations.]  "'[F]light requires neither the physical act of running nor the reaching of a far-away haven.  [Citation.] Flight manifestly does require, however, a purpose to avoid being

16

observed or arrested.""""" (*People v. Frazier* (2024) 16 Cal.5th 814, 839.)  "We review a claim of instructional error de novo." (*People v. Thomas* (2023) 14 Cal.5th 327, 382.)

The trial court did not err in instructing on flight.  The prosecution "need not prove the defendant in fact fled . . . ." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)  Instead, "[t]he instruction is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt." (*Howard*, *supra*, 42 Cal.4th at p. 1020.)  Here, such inference was reasonable.  In the wake of a law enforcement search, appellant and Brianna left the state, leaving behind abundant personal property in a residence for which they had paid $5,000 about two months prior.  Appellant's mother told their landlord appellant left due to an emergency.  It appeared to law enforcement "they had gathered as much stuff as they could and hit the road."  The jury could have reasonably concluded appellant's abrupt egress reflected consciousness of guilt.

Although the evidence may also be compatible with the inference that appellant left to avoid police harassment, "[t]he evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence." (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)  A phone call indicating appellant would voluntarily surrender if charged does not nullify all the evidence of flight.  (See *People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1477 ["Alternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury, not the court, to decide"].)  On this record, the trial court did not err in giving CALCRIM No. 372, which tasks the jury with determining whether the defendant fled.

To the extent appellant separately argues the instruction impermissibly lessened the prosecutor's burden of proof, we reject

17

that argument in light of established Supreme Court precedent. (See *People v. Fraizer*, *supra,* 16 Cal.5th at pp. 841-842.)

*Denial of Midtrial Continuance*

Appellant argues the court abused its discretion and violated his rights to due process and effective assistance of counsel by denying his request for a continuance to obtain the testimony of Garrett Ortali. Appellant also cites other rights in this regard, including the right to equal protection. We conclude the continuance denial did not constitute an abuse of discretion or violate any of appellant's rights.

*1. Additional Factual and Procedural Background*

Furia testified he spoke to Sergeant Kemp about this case while in county jail. Kemp gave Furia a business card, and Furia was attacked and accused of being a snitch. Furia testified he had no knowledge of Reed being responsible for Marti's death. Furia denied telling the inmates who confronted him that Reed did it. Furia also denied saying, "I didn't snitch on him, he snitched on me first."

Kemp also interviewed Ortali while he was in custody. Kemp testified that, based on Ortali's statement, Furia was beaten up after Kemp spoke with Furia and gave him a business card. The court sustained a hearsay objection after defense counsel attempted to probe further.

Defense counsel planned to call Ortali to testify that Furia had implicated Reed and to use that testimony to attack the credibility of the investigation and investigating officer. As of July 5, 2022, Ortali was in federal custody and not subpoenaed. Defense counsel detailed the unsuccessful efforts to subpoena Ortali and indicated Ortali's custodians required 10 business days. The court stated "it would be an extraordinary difficulty to continue the trial two weeks for that purpose." The jury window

ended on July 8, and the court had already indicated delaying another witness's testimony until July 8 would be "a huge inconvenience and we are in danger of losing some jurors." The court reviewed the Ortali interview transcript before ruling.

According to that transcript, Furia "told a story about how it wasn't [Furia] that did it. It was the boyfriend [Reed] that did it." Ortali indicated that when Furia was confronted for cooperating with law enforcement, Furia said, "No, no, no I didn't tell on him [i.e., Reed], he told on me first." It is unclear whether Ortali heard these statements directly, as Ortali stated, "it's all war stories from what I hear." Ortali also relayed Furia's account of the events leading up to Marti's disappearance. That account largely tracked Furia's police statements. Ortali challenged the logic of Furia's account. Ortali speculated Marti overdosed and was left in a muddy field by Reed and Furia.

The court chose not to delay the trial. The court did not find that preventing Ortali from testifying would deprive appellant of a fair trial.

### 2. Analysis

"A trial court has broad discretion to grant or deny continuances." (*Mora*, *supra*, 5 Cal.5th at p. 508; Pen. Code, § 1050, subd. (e).) "When a continuance is sought to secure the attendance of a witness, the defendant must establish 'he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) "The court 'must consider ""not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses,

19

jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion."'""'" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 387 (*Gonazlez*).)

"A trial court's discretion 'may not be exercised so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.'" (*Gonzalez, supra,* 12 Cal.5th at p. 387.) "We review a trial court's denial of a continuance request for abuse of discretion." (*Mora, supra,* 5 Cal.5th at p. 508.)

"'"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."'" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 287-288.) "'[O]nly an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.'" (*People v. Alexander* (2010) 49 Cal.4th 846, 934.)

The trial court did not err in denying the requested continuance. Much of Ortali's interview, including the idea that Marti overdosed and was left in a field, constituted mere speculation. Moreover, the interview transcript failed to establish whether Ortali directly heard Furia make statements implicating Reed. Given this uncertainty, the court rationally doubted whether Ortali would "be able to produce admissible evidence . . . ."

Ortali's testimony would have done little, if anything, to impeach law enforcement's investigation. Sergeant Kemp already explained Reed was a person of interest before stronger evidence led to appellant. Especially considering the burden associated with significantly exceeding the timeframe given to the jury, the court's ruling promoted substantial justice. That

20

ruling did not constitute an abuse of discretion, nor did it deprive appellant of due process, the effective assistance of counsel, or any other right.

*Cumulative Prejudice*

We reject appellant's cumulative prejudice argument. "'We have found no error, and where we assumed error, we have found no prejudice. Nor do we discern cumulative prejudice.'" (*People v. Duong* (2020) 10 Cal.5th 36, 75.) Appellant received due process and a fair trial. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

GILBERT, P. J.

YEGAN, J.

21

Jesse J. Marino, Judge

Superior Court County of San Luis Obispo

_____

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Blythe J. Leszkay, Deputy Attorney General, for Plaintiff and Respondent.