Filed 8/20/25  P. v. Berger CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100138 |
| Plaintiff and Respondent, | (Super. Ct. No. 20FE013777) |
| v. | |
| CHRISTOPHER BERGER, | |
| Defendant and Appellant. | |

A jury found defendant Christopher Berger guilty of murder and four counts of unlawful discharge of a firearm from a motor vehicle for his participation in the shooting death of Alex C.  On all counts, the jury found true the allegation that Berger personally discharged a firearm, causing great bodily injury during the commission of the offenses.  The trial court sentenced Berger to 125 years to life, plus eight years four months in state prison.  On appeal, Berger contends that instructional error deprived him of a fair trial and that the trial court erred in refusing to strike the firearm enhancements and/or

1

consider sentencing him to a lower term for the firearm enhancements.  We disagree and thus affirm.

## BACKGROUND

Between 12:00 and 1:00 a.m. on August 24, 2020, Jobani O. hung out with his friends Angel E., Alex C., and Jois O. at the vacant house across the street from his home. They drank, smoked marijuana, and did cocaine.  Jobani testified that he was not a member of a gang but said that Alex was a member of a subset of the Sureño gang.[1] Neither he nor his friends were armed.

After about an hour, a dark-colored four-door vehicle approached them and stopped.  The driver, later determined to be Berger, opened his window and asked in Spanish if they needed some "weed."  Before anyone could respond or even approach the vehicle, Berger shot at them.  Jobani saw a spark from the muzzle of the gun from the driver's seat; he was shot in the forearm.  Bleeding, he ran toward his house as Berger continued to shoot at them from his vehicle.  Jobani saw Alex get shot and immediately fall to the ground.  In total, Jobani estimated he heard more than 10 shots being fired consecutively at them from the vehicle.

When Jobani entered his home, he told his uncle to call an ambulance.  Jobani was also shot in his chest and the area under his right arm.  He stayed at the front of the house on the couch until the ambulance arrived.  Jobani was transported to the hospital where he had surgery on his left arm because of his gunshot wounds and he spent two days in the hospital.  When police arrived at the home, Jobani's brother told them about his registered firearm that was locked in a box in his room.

---

[1]     An expert in the Norteño and Sureño gangs and their subsets testified at trial that Jobani O. was known as an associate of the Sureño gang, Angel E. was an admitted Sureño gang member, and Alex C. was a validated Sureño gang member.

The sound of gunshots was reported to police at about 12:58 a.m., and a minute later, surveillance video recorded a dark-colored sedan travel away from the area of the shooting at a high rate of speed.

When police officers arrived at the scene, Angel and Jois were leaning up against a car parked in the street and Alex was lying down in the street in front of the other two. Alex was dead from a gunshot wound to his head. He also had gunshot wounds to his wrist and hip/waist.

Angel suffered eight gunshot wounds to his thigh, groin, and buttocks. He required surgery and he spent three days in the hospital. Jois suffered a gunshot wound to his thigh.

Law enforcement officers found 10 spent .45-caliber shell casings and several spent bullets at the scene of the shooting. All 10 shell casings and a shell casing that was purportedly found in Berger's vehicle were fired by the same firearm. Officers further determined that the casings were fired by a specific Glock Model 30 .45-caliber semi-automatic pistol that was later recovered during an unrelated traffic stop in a different town.[2]

Alfonso B.[3] was a close friend to Berger since middle school. Alfonso previously associated with a gang but claimed that he "dropped out." On August 24, 2020, after the shootings, Berger texted that his Chevrolet Impala was stolen. Alfonso agreed to help

---

[2]   On April 15, 2021, while responding to a traffic stop, law enforcement recovered a black Glock 30 .45-caliber semi-automatic firearm with an extended magazine with a round in the chamber. On April 27, 2021, law enforcement involved in the instant case facilitated obtaining that firearm. It does not appear the person involved in the traffic stop was involved in the instant shooting.

[3]   Alfonso testified pursuant to order under Penal Code section 1324. He also testified he received threats over his involvement in the case.

Berger find his car. After driving around with Berger for about two hours, they spotted the car close to Alfonso's sister's house.

Berger eventually admitted that his car had not been stolen. Berger told Alfonso that he was out driving, trying to buy some "weed," when "some southerners" reached inside the door of his car, "grabbed on him," "and it went south." Berger told Alfonso that he started to shoot when they grabbed him and his door. Alfonso further explained that "southerners" referred to rival gang members of "northerners" and that both Berger and Alfonso were "northerners."[4] Berger told Alfonso that he disposed of the firearm he used to shoot the people "in the water somewhere."[5]

Berger told Alfonso he was going to leave town and asked Alfonso to get rid of the car. Alfonso agreed to help but did not want to do it himself. He was "in a panic" because he feared someone would link him to the shootings. He found Joseph A., whom he referred to as a "tweaker." Joseph lived around the corner from Alfonso's sister's house. Alfonso told Joseph about the car, that it had the keys in it, and offered Joseph money to take the car away from his sister's house. Later that month, the police stopped Joseph while driving Berger's black Chevrolet Impala.

Joseph[6] testified that Alfonso offered him money to get rid of the car. Joseph said he found the black Chevrolet Impala with the keys in the ignition and drove it as his own. A couple of days later, Alfonso saw Joseph in the car, became upset, and said: "I told you

---

**4**    The gang expert reviewed photos of Berger and found his tattoos to be indicative of Norteño gang membership. Berger's social media accounts also contained several references to the Norteño criminal street gang.

**5**    Berger's cellular phone records revealed that on April 24, 2020, after the shooting at approximately 4:00 a.m., Berger's phone was in a park close to a river.

**6**    Joseph testified pursuant to order under Penal Code section 1324. He admitted to being convicted of vehicle theft (Veh. Code, § 10851) in 2015, 2021, and 2022.

to get rid of it." Joseph promised to do so but never did. After he was arrested with the car, Joseph told police that he found a shell casing on the floorboard of the passenger side back seat of the car and threw it in the garbage dumpster of his apartment complex. Police detectives later located that shell casing. Approximately two weeks after he was arrested, Alfonso approached Joseph and accused Joseph of being a "snitch."

Berger's cellular phone records placed him in the vicinity of the shootings at the relevant time and date. They also revealed that after the homicide, he left the area of the shootings and was travelling within the metro area until approximately 7:00 a.m. At 7:00 a.m., Berger reported that his car had been stolen. He told police that he had been smoking marijuana in his car the night prior and he became tired and went inside his house. It was not until the next morning when he realized his car was missing.

On August 27, 2020, police officers arrested Berger at a hotel room in town. The room was registered to Berger's girlfriend. Berger had a phone and $6,060 in cash on his person. Police also found Berger's wallet, his identification, his social security card, and heroin in the hotel room.

Police officers searched Berger's home and found the registration for the Chevrolet Impala, as well as ammunition of various calibers.

While in jail awaiting trial, Berger made several phone calls that were recorded and played to the jury. For example, the jury heard that on August 31, 2020, Berger instructed a person identified as "Cassandra" to delete "every single message" on his Instagram social media account.[7] The jury also heard that on September 8, 2020, Berger told a person: "Fuck that [n-word][8] Alfonso [B.], blood. It's on site with that [n-word]. Green light that [n-word]. That [n-word]'s a fucking rat, bro." The gang expert testified

---

[7]     A subsequent review of Berger's social media records revealed that someone using his Instagram username and password deleted the messages in his account.

[8]     We choose to redact Berger's language.

that "green light" is the go-ahead to other members of the gang to commit either a crime or an assault on somebody.[9]

Review of Berger's Gmail and iCloud accounts revealed two videos of Alex C.'s candlelight vigil. The first was taken on August 25, 2020, and the second on August 27, 2020, both at the location where the homicide occurred. According to the gang expert, Berger's possession of these videos served as a keepsake and/or a reminder of something he or his gang did.

Berger's cellular phone also contained a video of a Glock firearm taken on August 18, 2020. Reviewing the video frame by frame, police verified that the Glock Model 30 .45-caliber firearm in the video had the same last three serial numbers as the firearm recovered from the traffic stop in 2021 and used in the shooting. A few days before the shooting, Berger wrote a message to Alfonso about a "G-30" still in its box, which likely referred to a Glock Model 30.

Law enforcement found gunshot residue on the front driver interior door panel, the gear shift, and the rear driver interior door panel inside Berger's car. There were no bullet holes in the Chevrolet Impala, or any other evidence suggesting the victims shot at the car.

On June 8, 2023, the prosecution charged Berger in count one with murder (Pen. Code,[10] § 187, subd. (a)), and in counts two, three, four, and five with unlawful discharge of a firearm from a motor vehicle (§ 26100, subd. (c)). In association with all counts, the prosecution further alleged that Berger personally discharged a .45-caliber semi-automatic firearm, causing either great bodily injury and death (counts one & two), or

---

[9] According to Barreras, however, "green-light" means, "It's just a go, all good," but he acknowledged he is a rat for testifying against Berger and now has a target on his back.

[10] Undesignated statutory references are to the Penal Code.

great bodily injury (counts three, four & five) during the commission of the offenses pursuant to section 12022.53, subdivision (d).

The jury found Berger guilty of all counts and found true all associated allegations. The trial court subsequently sentenced Berger to 125 years to life, plus eight years four months in state prison as follows: 25 years to life on count one, 25 years to life on four of the five section 12022.53, subdivision (d) enhancements, the middle term of five years on count three and one year eight months on counts four and five.

## DISCUSSION

### I

### *Jury Instructions*

Berger contends the trial court erred when it sua sponte instructed the jury that self-defense did not apply when the person does not act out of fear alone but only out of fear and a desire to harm the attacker. According to Berger, this confused the jury and allowed it to improperly reject his theory of self-defense. He also contends the trial court erred in instructing the jury with CALCRIM No. 372, which allowed the jury to consider whether Berger's flight indicated his consciousness of guilt. According to Berger, the evidence did not support the instruction. We disagree with both contentions.

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)" (*People v. Najera* (2008) 43 Cal.4th 1132, 1136.)

We review claims of instructional error de novo. (*People v. Parker* (2022) 13 Cal.5th 1, 66; *People v. Rivera* (2019) 7 Cal.5th 306, 326.) " 'In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled.' " (*People v. Tran* (2022)

7

13 Cal.5th 1169, 1199.)  We assume "jurors are intelligent and well able to understand and integrate all the instructions given." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 791.)

A.  *People v. Nguyen* and Self-Defense

A trial court has a duty to instruct sua sponte on particular defenses " ' " 'if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1052; accord, *People v. Salas* (2006) 37 Cal.4th 967, 982.)

With respect to self-defense, the court instructed the jury with CALCRIM Nos. 500 and 505.  CALCRIM No. 500 instructed, in relevant part:  "A homicide can be lawful or unlawful.  If a person kills with a legally valid excuse or justification, the killing is lawful and he has not committed a crime. . . .  You must decide whether the killing in this case was unlawful."  Through CALCRIM No. 505, the court instructed the jury, in relevant part, "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense or defense of another.  The defendant acted in lawful self-defense or defense of another if:  [¶]  1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffer great bodily injury;  [¶]  2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;  [¶]  AND  [¶]  3. The defendant used no more force than was reasonably necessary to defend against that danger."

The court also instructed the jury on voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571) in relevant part:  "The difference between complete self-defense or defense of another, and imperfect self-defense or imperfect defense of another, depends on whether the defendant's belief in the need to use deadly force was reasonable."  In addition, the court instructed the jury on voluntary manslaughter based on sudden quarrel or heat of passion (CALCRIM No. 570) in relevant part:  "The

8

defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. the defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Defense counsel did not object to these instructions, request additional instructions, or ask for any modifications or amplifications to these instructions. But, over defense counsel's objections, the court also instructed the jury pursuant to *People v. Nguyen, supra*, 61 Cal.4th 1015 as follows: "Self-defense is not available when the party does not act out of fear alone, but out of fear and a desire to harm the attacked. The party killing is not precluded from feeling anger or other emotions save and except fear, however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense." Defense counsel argued that the court should use language from *People v. Trevino* (1988) 200 Cal.App.3d 874 instead, but the trial court stated it preferred to rely on more recent California Supreme Court authority.

The additional *Nguyen* instruction is a correct statement of law. As noted, CALCRIM No. 505 states in part that a defendant is justified in killing somebody in self-defense if the defendant believed there was imminent danger of death or great bodily injury to the defendant, and the defendant acted only because of that belief. The instruction is based on sections 197 and 198. Section 197 states a homicide is justifiable, "[w]hen committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony . . . ." Section 198 adds, "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone."

9

The plain language of the statutes clearly dictates that, for a homicide to be justified, objectively reasonable fear must be a defendant's sole motive for killing. Indeed, California authority dating back more than a century establishes that self-defense is available only to those who kill solely out of a reasonable fear of great bodily injury or death. (See *People v. Ye Park* (1882) 62 Cal. 204, 207-208 [self-defense instruction requiring acquittal if the defendant acted on the basis of reasonable fears held properly refused, because " 'the party killing must have acted under the influence of such fears *alone*' "]; *People v. Hecker* (1895) 109 Cal. 451, 463 [conduct of person acting in self-defense "must not be in revenge" and must be "in good faith to the sole end of winning his safety and securing his life"], superseded by statute on other grounds as stated in *People v. Hardin* (2000) 85 Cal.App.4th 625, 633-634; *People v. Vernon* (1925) 71 Cal.App. 628, 629 [upholding modification to requested instruction that limited self-defense to killing under the influence of fear " 'alone' "].)

Berger contends the additional *Nguyen* instruction "added unnecessary elements that likely confused and misled the jury as to what it must find for self-defense to apply." According to Berger, if the jury thought he was the shooter, it had to decide the veracity of his statement to Alfonso that he was forced to fire his gun during a drug deal gone bad. Because there was evidence that the victims were from a rival gang, "it was possible that [Berger] acted out of fear for his safety and anger at the rival gang members' actions." But if the jury believed Berger acted out of fear for his safety *and* anger at the rival gang members' actions, self-defense did not apply and there could be no confusion caused by the additional *Nguyen* language.

Nevertheless, Berger contends that by telling the jury that the defendant cannot act out of fear and a desire to harm the attacker, the *Nguyen* instruction "turned an objective test into a subjective one" and undermined his defense when the jury was also asked to determine whether his self-defense was imperfect or whether he acted upon provocation in the heat of passion. Because there was a question of whether Berger was motivated to

10

shoot the victims based solely on fear or a combination of emotional motives, Berger argues the additional *Nguyen* instruction could have prompted the jury to improperly reject his self-defense claim. Not so.

In *People v. Trevino, supra*, 200 Cal.App.3d at pages 878 through 879, the appellate court rejected the defendant's argument that, when the circumstances of the case suggest mixed motives for the killing, it would be inappropriate to instruct a jury that self-defense only applies when the defendant is motivated by fear alone. The *Trevino* court explained the law does not preclude self-defense merely because "a person . . . feels anger or even hatred toward the person killed." (*Id*. at p. 879.) "The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense. But if the only causation of the killing was the reasonable fear that there was imminent danger of death or great bodily injury, then the use of deadly force in self-defense is proper, regardless of what other emotions the party who kills may have been feeling but not acting upon." (*Ibid*.; see also *People v. Shade* (1986) 185 Cal.App.3d 711, 716 [rejecting the argument that the jury was not properly instructed when it was told the killer must have acted out of fear alone for self-defense to apply].)

In *Nguyen*, our Supreme Court held a defendant is not entitled to assert self-defense if "he did not act on the basis of fear alone but also on a desire to kill his rival." (*People v. Nguyen, supra*, 61 Cal.4th at p. 1044.) The *Nguyen* court cited *Trevino* with approval: "*Trevino* clarified that this rule does not 'imply that a person who feels anger or even hatred toward the person killed, may never justifiably use deadly force in self-defense,' " only " 'that the party killing act out of fear alone.' " (*Nguyen*, at p. 1045; see *People v. Adams* (1890) 85 Cal. 231, 235 [self-defense instructions properly required that the defendant " 'acted under the influence of such fears alone' "].) Thus, the additional *Nguyen* instruction did not mislead the jury regarding the proper application of self-

11

defense. Indeed, defense counsel requested the trial court instruct the jury pursuant to *Trevino* and as *Nguyen* approved of *Trevino*'s clarification of the law regarding self-defense, we see no error in providing additional language pursuant to *Nguyen*, rather than pursuant to *Trevino*.

Berger fails to convince us that the additional *Nguyen* instruction confused and misled the jury regarding the voluntary manslaughter instructions. With respect to voluntary manslaughter with imperfect self-defense, "[t]he subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262.) "If the trier of fact finds the requisite belief in the need to defend against imminent peril, the choice between self-defense and imperfect self-defense properly turns upon the trier of fact's evaluation of the reasonableness of appellant's belief." (*Ibid.*) Because the additional *Nguyen* instruction does not pertain to the reasonableness of the defendant's belief regarding imminent danger, the additional language did not confuse the issue related to self-defense versus imperfect self-defense. Nor, contrary to Berger's claim, did it turn the objective test into a subjective one. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [explaining the distinction between the subjective belief in the need to defend and whether the belief is objectively reasonable].)

Similarly, in determining whether Berger committed voluntary manslaughter under a heat of passion theory, the jury had to determine whether Berger was provoked and, as a result, "acted rashly and under the influence of intense emotion that obscured his reasoning or judgment," and that the "provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570.) Unlike in self-defense, any violent or intense emotion that causes a person to act without due deliberation and reflection can motivate acts in the heat of passion. But the additional *Nguyen* instruction refers only to the

12

emotion that motivates a *justifiable* killing, it does not reference acting without deliberation or reflection, which mitigates but does not justify the killing. Thus, the *Nguyen* instruction did not confuse the issues between self-defense and voluntary manslaughter based on heat of passion.

At most, we see the *Nguyen* instruction as serving as a reminder of the principle at law already present in CALCRIM No. 505—that is, for the homicide to be justified by self-defense, Berger's fear for his life had to be reasonable and prompt the killing.

B. Flight

Over defense counsel's objection, the trial court instructed the jury pursuant to CALCRIM No. 372 as follows: "If the defendant fled or tried to flee immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt. If you conclude that a defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that a defendant fled or tried to flee cannot prove guilt by itself." The court disagreed with defense counsel's contention that there was no evidence of flight where Berger was found in a hometown hotel room rented by someone else and the evidence suggested he just was there to sell drugs. Instead, the court concluded that while the jury could reject the prosecutor's argument that Berger fled, the evidence was sufficient to warrant the instruction.

A flight instruction "is statutorily required when flight evidence is relied upon by the prosecution." (*People v. Howard* (2008) 42 Cal.4th 1000, 1020; see also § 1127c.) " ' "In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citations.] ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' " ' " (*People v. Frazier* (2024) 16 Cal.5th 814, 839.)

13

Here, such inference was reasonable. First, the jury could infer Berger fled from the scene of the shooting, as Berger told Alfonso that he shot people after a drug deal went bad, and there was video of a dark-colored sedan leaving the area at a high rate of speed around the time of the shooting (Berger drove a black Impala) in the direction of Berger's home. The evidence supported a reasonable inference that he sped away with the intent to avoid being captured.

In addition, Berger told Alfonso he was going to leave town, asked him to get rid of his car, and, a few days after the shootings, the police could not find Berger at his home. Instead, police found him in a hotel room that was registered to his girlfriend. Berger was carrying over $6,000 in cash and police found 94 grams of heroin and other indicia that Berger was selling drugs from the hotel room. The room looked "used" but it was unclear whether anyone was staying there. The jury could have reasonably concluded these circumstances reflected either that Berger intended to amass enough money from his drug sales to leave town or, at minimum, to avoid encountering the police by staying away from home. Although this evidence may also be compatible with the inference that Berger's presence at the hotel room was only to sell drugs, "[t]he evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence." (*People v. Richardson* (2008) 43 Cal.4th 959, 1020, superseded by statute on other grounds as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509; see also *People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1477 ["Alternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury, not the court, to decide"].)

Finally, we conclude that any error in giving the instruction was harmless as it is not reasonably probable that Berger would have obtained a more favorable result had the flight instruction not been given. The instruction "did not assume that flight was established, but instead permitted the jury to make that factual determination and to decide what weight to accord it." (*People v. Carter* (2005) 36 Cal.4th 1114, 1182-1183; accord, *People v. Richardson, supra*, 43 Cal.4th at p. 1020 ["the instruction applied only

14

if the jurors found flight had been shown; if they did not so find here, they would have disregarded the flight instruction as they were also instructed"].) Further, the instruction clarified that evidence that he fled or tried to flee cannot prove guilt by itself. (See *People v. Scott* (1988) 200 Cal.App.3d 1090, 1095 [noting the cautionary aspects of a flight instruction].) Finally, the prosecution presented compelling evidence that Berger committed the charged crimes whether or not the jury thought he fled afterward.

To the extent Berger separately argues the instruction impermissibly lessened the prosecutor's burden of proof, we reject that argument in light of established Supreme Court precedent. (See *People v. Fraizer, supra*, 16 Cal.5th at pp. 841-842.)

C. Cumulative Error

"Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ['Under the "cumulative error" doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial.'].)" (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216-1217.) Here, there are no errors to cumulate. Accordingly, Berger cannot demonstrate the cumulative effect of the alleged errors resulted in prejudice. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["As noted, claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate"], superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 745.)

II

*Sentencing*

Berger asks us to remand for resentencing, claiming the trial court erred in two ways when it imposed the firearm enhancements. First, he claims the trial court abused

15

its discretion in refusing to dismiss the firearm enhancement because the length of his sentence after applying the enhancement's 25-year-to-life term exceeds 20 years. (See § 1385, subd. (c)(2)(C).) Second and alternatively, he argues the court erred when it failed to consider or to reduce it to a lesser firearm enhancement under *People v. Tirado* (2022) 12 Cal.5th 688. The People respond that Berger's contentions are forfeited and have no merit. We agree with the People.

We review a trial court's order denying a motion to dismiss a sentence enhancement for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 373-374.) Similarly, abuse of discretion is the proper standard of review for the trial court's determination that dismissal of an enhancement would endanger public safety. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.)

A. Additional Background

During the sentencing hearing, the court confirmed it received defense counsel's sentencing memo and understood the individual arguments. In the memo, counsel requested the court to strike the 12022.53, subdivision (d) enhancements as to counts three through five, arguing that section 1385, subdivision (c)(2)(B) compelled striking the allegations because the case involved multiple enhancements based on a single event and pursuant to section 1385, subdivision (c)(2)(C) where the application of an enhancement would result in a sentence of over 20 years. Counsel also contended, without argument, that the application of an enhancement could result in a discriminatory racial impact.

The court recognized that it had discretion to strike the firearm enhancements pursuant to section 1385, subdivision (c)(2), but refused to do so. In explaining the ruling, the court noted the statutory requirement to "consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances . . . are present." The court also noted that proof of the "presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the Court finds that dismissal of the enhancement or enhancements would endanger public safety."

16

The court stated it "considered all of the general objectives in sentencing as set forth in California Rules of Court 4.410" and noted that Berger would have been 22 years old at the time of the offenses. The court also considered the fact that application of the enhancements would result in a sentence of over 20 years, and that multiple enhancements were alleged in a single case.

The court went on: "I don't find, however, that application of the enhancements in this case would result in a discriminatory racial impact, as defined in Penal Code Section 745[, subdivision ](a)(4)(A), and, certainly, the defense has not proved with a preponderance of the evidence that this mitigating factor applies. [¶] . . . [¶]

"I recognize that I have the discretion to strike the enhancements in consideration of mitigating factors under 1385[, subdivision ](c)(2). I placed great weight on the mitigating factors that I already identified and adopted in this case—the defendant's age, the effect of imposing each enhancement on his sentence which would produce a sentence well in excess of 20 years, but just one count would do that.

"Notwithstanding a careful consideration of those factors in mitigation, I decline to strike the enhancements, as I believe this conduct was so gratuitous, so violent, was so lacking of any excuse of a defense, as to cause me to believe that to dismiss any of the enhancements would greatly endanger public safety.

"Based on Mr. Berger's conduct as evinced from the trial, I believe that, were he ever released, his presence in the public would result in physical injury or other serious danger to others. I might add that there was no evidence tendered that Mr. Berger has ever been legitimately employed, in school, had graduated high school, had done well in high school, taken college classes, was involved in learning a trade or doing anything at the time of this offense that might be viewed as constructive.

"I witnessed throughout the pendency of this case, up to today, no showing of regret for the conduct and no remorse manifest on his part.

17

"The trial produced evidence of Mr. Berger's gang affiliation, his involvement in drug sales, and in this case evidence that he was driving around a neighborhood with a loaded firearm, that he stopped his car in front of the gathering with [Alex] and then opened fire on everyone present.  [¶] . . . [¶]

"In an effort to cover up his offense, he lied to a friend, Alfonso [B.], when he told [Alfonso] that his car had been stolen.  He then implicated [Alfonso] in his criminal conduct by convincing him to be an accessory after the fact by encouraging him to get rid of the car.  His conduct demonstrates a cold, almost narcissistic, calculated focus on himself with little to no regard for others.

"This mindset was further displayed in the jail call made by Mr. Berger to an associate of his after the defendant learned that [Alfonso] had finally come clean to law enforcement and agreed to tell law enforcement what had actually happened, quite reluctantly.

"Once Mr. Berger learned that [Alfonso] had spoken to law enforcement and would be a witness for the prosecution, the evidence showed Mr. Berger communicated to his associate that [Alfonso] needed to be, quote, 'green-lighted,' meaning killed.  This conduct that was committed while charges were pending, while he was awaiting trial, demonstrates he continued to present a danger to the community long after the shootings in this case and even when he was in custody.  [¶] . . . [¶]

"Accordingly, I find that, were he ever released, Mr. Berger constitutes a serious danger to the public, and were the Court to dismiss all or most of the 12022.53[, subdivision ](d) enhancements, thereby permitting an early parole release, this would result in physical injury or other serious danger to the public."

B.  Section 12022.53, subdivision (d)

"Effective January 1, 2022, Senate Bill No. 81 (2021-2022 Reg. Sess.) amended section 1385 to include subdivision (c).  (Stats. 2021, ch. 721.)  Section 1385[, subdivision ](c)(1) provides that '[n]otwithstanding any other law, the court shall dismiss

18

an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.' [Citations.] Section 1385[, subdivision ](c)(2) provides as follows: 'In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. "Endanger public safety" means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (*People v. Mendoza, supra*, 88 Cal.App.5th at p. 295.)

Berger claims the mitigating circumstance present here is that application of the enhancements would result in a sentence of over 20 years (§ 1385, subd. (c)(2)(C)). He further contends that his youthfulness and lack of adult criminal history were factors in favor of a lower sentence. Berger contends that serving a sentence that contains more than one firearm enhancement does not protect society in any greater fashion than if the court had only imposed one or none of the enhancements, as the sentence he would face would be long enough to deter further criminality upon release. In the end, he contends, the court abused its discretion to impose an unnecessarily long sentence upon a youthful offender, creating an unjust sentence that contributed to racial disparities in sentencing.

Considering the detailed findings by the court, Berger has failed to persuade us the court abused its discretion in refusing to strike the firearm enhancements. (See *People v. Carmony, supra*, 33 Cal.4th at pp. 376-377 [party attacking the judgment must clearly show abuse of discretion].) The court was authorized to consider the "circumstances specific to the crime" in deciding whether dismissing the enhancement would endanger public safety. (*Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 497; Cal. Rules of Court, rule 4.421.)

The evidence in the record amply supports the court's decision. As the court noted, Berger's decision to open fire onto a group of young men constituted "gratuitous violence." Burger shot Alex multiple times, including a fatal shot to his head. These acts leading to Alex's murder was a crime that "involved great violence, great bodily harm." (Cal. Rules of Court, rule 4.421(a)(1).) Three additional victims suffered serious and/or multiple gunshot wounds that required surgery and hospitalization, establishing that Berger engaged in violent conduct—with the use of a weapon—that indicates a serious danger to society. (Cal. Rules of Court, rules 4.421(a)(2) & 4.421(b)(1).) In addition, Berger exhibited no remorse for the event and instead lied to his friend Alfonso in order to get Alfonso to cover Berger's tracks by getting rid of his car for him. When Alfonso told law enforcement what happened, Berger labeled Alfonso a "rat" who needed to be killed. (Cal. Rules of Court, rule 4.421(a)(6).) As this threat was made while charges against him were pending, Berger continued to pose a danger to public safety. Thus, the court's conclusion that dismissing the firearm enhancements would endanger public safety was not "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra*, 33 Cal.4th at p. 377; see also *People v. Mendoza, supra*, 88 Cal.App.5th at p. 299 [" 'incredibly harmful and dangerous conduct' " of "discharg[ing] a gun with victims present in a residence" supported superior court's determination that dismissing firearm enhancement would endanger public safety]; *People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 322-323 [no abuse of discretion in declining to dismiss firearm enhancement based on " 'very serious' " facts of offense, even though the defendant was "apologetic" and lacked serious criminal history]; *People v. Cervantes* (2021) 72 Cal.App.5th 326, 332 [court properly exercised discretion not to strike § 12022.5 enhancement due to "the serious nature of appellant's . . . acts of violence" and his "potential danger to the community"].)

C. *People v. Tirado*

Berger also asserts the trial court erred in failing to consider or impose a lesser included firearm enhancement in lieu of the section 12022.53, subdivision (d) enhancement, as opposed to dismiss it outright. (See *People v. Tirado, supra*, 12 Cal.5th at p. 700; *People v. McDavid* (2024) 15 Cal.5th 1015, 1030.) He argues that defense counsel essentially requested the court reduce the firearm enhancement by arguing that a low term was appropriate. Berger also contends that if we deem the issue forfeited, counsel provided ineffective assistance by failing to expressly request the court exercise its discretion pursuant to *Tirado*.

This separate claim of sentencing error is forfeited because Berger did not specifically request the court impose a lesser enhancement. (See *People v. Scott* (1994) 9 Cal.4th 331, 356 ["complaints about the manner in which the trial court exercises its sentencing discretion . . . cannot be raised for the first time on appeal"]; *People v. Gonzalez* (2003) 31 Cal.4th 745, 755 [sentencing challenges on appeal are limited to specific grounds raised below].)

We also disagree with Berger's alternative contention that, as there was no valid tactical reason for counsel to fail to ask the trial court to impose a lesser firearm enhancement under *Tirado*, counsel was constitutionally ineffective. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) To show prejudice, Berger must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) If it is more efficient to do

21

so, a reviewing court may resolve an ineffective assistance of counsel claim by deciding only the question of prejudice. (*Strickland*, at p. 697.)

Berger has not demonstrated that it is reasonably probable that he would have obtained a more favorable sentence had counsel presented the trial court with the *Tirado* sentencing alternatives. *Tirado* was decided in January 2022 (*People v. Tirado, supra*, 12 Cal.5th 688), almost two years before Berger's sentencing hearing in December 2023. Absent an indication to the contrary, we presume the trial court understood the full panoply of its sentencing discretion and applied the law. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) Berger has pointed to nothing in the record establishing the trial court misunderstood its discretion or was inclined to impose anything less than the 25-year determinate term associated with the section 12022.53, subdivision (d) enhancements. In fact, as discussed above, the trial court's detailed ruling regarding why it declined to dismiss any of the firearm enhancements strongly suggests the contrary. Accordingly, Berger's claim must fail.

DISPOSITION

The judgment is affirmed.

/s/_____<br>EARL, P. J.

We concur:

/s/_____<br>ROBIE, J.

/s/_____<br>WISEMAN, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.